**SIERRA VISTA HOSPITAL, INC. et al.,**

v.

**The UNITED STATES.**

**Nos. 488–78 and 466–79C.**

United States Court of Claims.

Jan. 14, 1981.

Robert A. Klein, Washington, D. C., attorney of record for plaintiff. Weissburg & Aronson, Inc., Washington, D. C., of counsel.

Sandra P. Spooner, Washington, D. C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, KUN-ZIG and BENNETT, Judges.

FRIEDMAN, Chief Judge:

Trial Judge C. Murray Bernhardt has certified for interlocutory review, pursuant to Rule 53(c)(2)(i), his order of September 23, 1980, refusing to disqualify the law firm that represents plaintiff in these consolidated cases, and the government has requested such review. The government sought disqualification because three former government lawyers who allegedly had various connections with the case during their government service joined the law firm while the case was pending. Upon consideration of the briefs, without oral argument, we conclude that the trial judge properly refused to disqualify the firm. We therefore grant the request for interlocutory review and affirm the trial judge's order.

## I.

A. In these cases the plaintiff challenges the government's denial of reimbursement under the Medicare program for California franchise taxes. The cases began with a suit the plaintiff filed in the United States District Court for the Northern District of California against the Secretary of Health, Education, and Welfare (HEW) in November 1973. The law firm of Weissburg and Aronson, Inc., located in Los Angeles, California, has represented the plaintiff in this litigation from the beginning.

Both parties moved for summary judgment in the district court, which granted the defendant's and denied the plaintiff's motion and dismissed the case. On appeal, however, the Court of Appeals for the Ninth Circuit in April 1979 remanded the case to the district court with directions to transfer it to this court. *Sierra-Vista Hospital, Inc. v. Califano*, 597 F.2d 200. That transfer case (No. 466–79C) has been consolidated with another case (No. 488–78) which the plaintiff filed in this court in 1978, apparently as a protective measure.

B. Sometime in the late spring or summer of 1979, Weissburg and Aronson opened a Washington office. The staff of that office consisted of three former government lawyers who, according to the government, had had various connections with these cases while working for the government. The facts relating to these lawyers' connections with the cases, as shown by the record before us (which consists largely of uncontradicted affidavits), are as follows:

1. *James Pyles* became associated with Weissburg and Aronson on August 1, 1979. Prior to that time he had been a lawyer with the Office of the General Counsel of HEW. Another lawyer in that office originally had handled the Sierra Vista case in the district court and had prepared the government's opening brief in the court of appeals. That lawyer left the General Counsel's office before oral argument was scheduled in the court of appeals.

Pyles prepared the government's reply brief in the court of appeals, which discussed only the jurisdiction of the district court over Medicare cases of this type. The United States Attorney's Office had "primary responsibility for handling the case on appeal," and Pyles' participation was limited to the jurisdictional issue and he had "absolutely no involvement in the development or presentation of the government's defense on the merits." Pyles appeared as "of counsel" on the government's reply brief, which the United States Attorney and an Assistant United States Attorney signed; Pyles also signed a motion for permission to exceed the normal page limit for reply briefs, and a supporting affidavit. Pyles sent the brief and motion to the United States Attorney's Office before August 8, 1977, and the brief and motion were submitted to the court on August 22, 1977. The Assistant United States Attorney in charge of the case "had a number of telephone conversations after that time concerning the various Medicare cases that were being decided" with Pyles, although the record does not show whether any of them related to these cases.

2. *Galen Powers* became a member of Weissburg and Aronson on or about June

16, 1979. When Pyles joined the firm several weeks later, Powers became his supervisor. "[A]t no time," however, had Powers "ever discussed any aspect of this case with Mr. Pyles, nor has Mr. Pyles had access to any of the records, files or documents concerning this litigation."

Prior to joining the firm, Powers had been an Assistant General Counsel at HEW. From 1973 to August 15, 1977, he was in charge of Medicaid matters and Pyles was not under his supervision or control. On August 15, 1977, as a result of a reorganization, Powers became Pyles' supervisor. That was after Pyles had completed his work on the court of appeals reply brief. Powers had

> no recollection of ever reviewing the files, documents, or records pertaining to that case, or communicating with the United States Attorney's Office, Mr. Pyles or with anyone else in connection with the litigation. Nor [did he] have any recollection of ever reviewing any work performed by Mr. Pyles on that case.

3. *Arlene Fine* became associated with Weissburg and Aronson on June 11, 1979, and left the firm on July 11, 1980. She worked in the Washington office except between November 26, 1979 and February 27, 1980, when she worked in the Los Angeles office. While with the firm she worked on these cases. That work "included a limited review of the file and the filing of a petition pursuant to Court of Claims Rule 181, a motion for consolidation, and an amended petition. [She] did no work nor conducted any review of the documents concerning the substantive merits of the action."

Prior to joining the firm, Ms. Fine worked in the Civil Division of the Department of Justice. The files of the Department show that the case had been assigned to her but that within two weeks after the petition was filed in this court, the case was reassigned to another lawyer. She did not enter an appearance as counsel of record.

Ms. Fine stated that "[t]o my knowledge and the best of my recollection, I never reviewed any files, conducted any research, generated any correspondence, or communicated with agency staff or opposing counsel concerning this matter, or performed any other work concerning the *Sierra Vista* case during my tenure with the Department of Justice." She further stated that during her association with Weissburg and Aronson she "never discussed the substance of the *Sierra Vista* case with either James C. Pyles or Galen D. Powers," or "show[ed] Mr. Pyles any documents relating to this case." Her "conversations with both Mr. Pyles and Mr. Powers concerning *Sierra Vista* were limited exclusively to the matter of ascertaining their prior involvements, if any, with the case while they were employed as attorneys with the Department of Health, Education and Welfare."

C. Robert A. Klein, the member of Weissburg and Aronson who was "primarily responsible for and involved in" these cases, upon learning that Pyles "had been involved in the instant proceedings as a government attorney, and that it would be improper for him to serve or aid plaintiffs' counsel in any capacity,"

> took the following steps to ensure that Mr. Pyles would be isolated entirely from this case: The professional and clerical staff of Weissburg and Aronson were instructed that Mr. Pyles could not have access to any of the files, documents or records of this case under any circumstances; the professional staff of Weissburg and Aronson was instructed that Mr. Pyles was neither to advise nor to consult with any attorney or other person with respect to any aspect of these proceedings; and all files, documents and records pertaining to this case were physically removed from the suite in which Mr. Pyles worked and transferred to an adjoining suite to which Mr. Pyles was denied access.

Although the cases originally had been handled out of the firm's Los Angeles office, the cases were transferred to the Washington office.

> To further ensure that Mr. Pyles would not inadvertently come into contact with any of the records of this case, on or

about April 2, 1980, all files, documents and records pertaining to this case were physically removed from the Washington, D.C. offices of Weissburg and Aronson, where Galen Powers and Jim Pyles are employed, and transferred to the Los Angeles office of Weissburg and Aronson, from which office the case is being managed.

D. In denying the government's motion to disqualify Weissburg and Aronson, the trial judge concluded that the firm

has taken proper steps to effectively quarantine Mr. Pyles from the case and from those in the firm handling it, there is no showing of unethical conduct by the firm in fact nor by superficial appearance, and the harshness of consequences to former government lawyers, to the firms employing them, and to their clients would far outweigh any dubious enhancement in the confidence of the public in the integrity of the legal profession.

## II.

The government contends that disqualification of Weissburg and Aronson is required by Disciplinary Rules 9–101(B) and 5–105(D) of the American Bar Association. The former states that a lawyer "shall not accept private employment in a matter in which he had substantial responsibility while he was a public employee." The latter states that "[i]f a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner, associate, or any other lawyer affiliated with him or his firm, may accept or continue such employment." Disciplinary Rule 9–101(B) is set forth after Canon 9 of the Canons of Professional Ethics, which states that "A Lawyer Should Avoid Even the Appearance of Professional Impropriety."

The government argues that Pyles' substantial involvement in these cases while a government attorney disqualifies him from participating in this litigation under Disciplinary Rule 9–101(B), and that his disqualification in turn disqualifies all the other lawyers in the firm and hence the firm under Disciplinary Rule 5–105(D). The government makes *"no allegations of actual impropriety"* but contends that the situation involves the very "appearance of impropriety ... against which Canon 9 is directed." (Emphasis in original.) It finds this appearance of impropriety "because it *appears* that the law firm 'purchased' almost the entire Government defense team" and it suggests that the public would view this "apparent wholesale 'raiding' of the Government's defense team while the litigation was pending" as not "merely coincidence." (Emphasis in original.)

Although this hyperbole is colorful, its factual bases are inaccurate, and it does not clarify the issues in this case or aid in their resolution.

Only one of the three lawyers involved—Pyles—had any substantial connection with these cases, and even that related not to the merits but to the jurisdiction of the district court, an issue no longer involved in the cases. Powers had no connection at all with the cases, since he became Pyles' supervisor at HEW only after Pyles had completed his work on the cases. Although the cases had been briefly assigned to Ms. Fine while she was in the Department of Justice, she, too, did not work on them and cannot be deemed to have participated in them.

We considered a similar issue of disqualification in *Kesselhaut v. United States*, 214 Ct.Cl. 124, 555 F.2d 791 (1977), the facts of which the government concedes "would be almost identical ... if Mr. Pyles were the only attorney involved." In *Kesselhaut* a former general counsel (Mr. Prothro) of the Federal Housing Administration (FHA) joined a law firm (Krooth and Altman) after his retirement. Kesselhaut, a lawyer who had handled a matter for FHA while Prothro was with that agency, then retained Krooth and Altman to sue FHA for his legal fee for that matter. Prothro had had contact with Kesselhaut on behalf of FHA regarding that prior case. Prothro never communicated with Kesselhaut concerning the merits of his claim for attorney's fees, never gave him information, ad-

vice, or guidance thereon, never gave Krooth and Altman advice, information, or guidance, and never looked at the documents in their files concerning the merits of Kesselhaut's claim.

The government moved to disqualify Krooth and Altman because of Protho's role. The trial judge held that the firm was disqualified.

After the case had been orally argued before us *en banc*, a senior partner in Krooth and Altman distributed a memorandum to the firm's lawyers

> providing that: Mr. Prothro is to continue to have no connection with the case, all other attorneys are not to discuss it with him and are to prevent any case documents from reaching him, the files are to be kept in a locked file cabinet, the keys controlled by Messrs. Altman and Krug and issued to other attorneys, clerks, and secretaries, only on a "need to know" basis.

*Id.* at 127–28, 555 F.2d at 793.

We held that the disqualification of Krooth and Altman was not warranted, stating that:

> an inexorable disqualification of an entire firm for the disqualification of a single member or associate, is entirely too harsh and should be mitigated by appropriate screening such as we now have here, when truly unethical conduct has not taken place and the matter is merely one of the superficial appearance of evil, which a knowledge of the facts will dissipate.

*Id.* at 128, 555 F.2d at 793.

■ Disqualification of the firm would be just as unwarranted in the present case as it would have been in *Kesselhaut.* The "screening" of Pyles was no less effective in preventing him from having any connection with the case than the screening of Prothro. Indeed, if anything, it was more effective since it was done as soon as Weissburg and Aronson became aware of Pyles' prior connection with the cases. In *Kesselhaut,* in contrast, the screening did not take place until after the trial judge had recommended disqualification and the issue had been orally argued before us.

In a recent *en banc* decision the Court of Appeals for the Second Circuit similarly approved the use of appropriate screening as a method of avoiding disqualification of an entire firm that was handling a case with which a former government lawyer who had joined the firm had connection during his government service. *Armstrong v. McAlpin,* 625 F.2d 433 (1980), *petition for cert. filed,* 49 U.S.L.W. 3190 (U.S. Sept. 18, 1980) (No. 80–431). The subsequent panel decision of that court in *Cheng v. GAF Corp.,* 631 F.2d 1052 (1980), upon which the government relies, did not question the general validity of screening techniques. The court there disqualified a law firm because it was "not satisfied that under *the facts of this case* the screening will be effective" to prevent disclosure to the firm of information the lawyer had obtained during his prior service with a nongovernment public interest organization. At 1058 (emphasis added). In the present case, however, we are satisfied that, as in *Kesselhaut* and *Armstrong,* the screening will be effective to prevent disclosure. *See* Comment, *The Chinese Wall Defense to Law-Firm Disqualification,* 128 U.Pa.L.Rev. 677 (1980).

■ The fact that two other former government lawyers also were affiliated with Weissburg and Aronson does not call for a different conclusion. As we have explained, neither Powers nor Ms. Fine had any meaningful or substantial connection with these cases. Even though the three former government lawyers constituted the entire legal staff of the Washington office of Weissburg and Aronson, the case involves only a "superficial appearance of evil, which a knowledge of the facts will dissipate." *Kesselhaut v. United States,* 214 Ct.Cl. at 128, 555 F.2d at 793. Once the facts we have set forth above are fully known, they dissipate any suggestion of impropriety in Weissburg and Aronson's continued participation in these cases.

The government points to the statement in Professional Ethics Formal Opinion 342 of the American Bar Association that

whenever the government agency is satisfied that the screening measures will effectively isolate the individual lawyer from participating in the particular matter and sharing in the fees attributable to it, and that there is no appearance of significant impropriety affecting the interests of the government, the government may waive the disqualification of the firm under D.R.5–105(D).

ABA Comm. on Professional Ethics, Opinions, No. 342 (1975), *reprinted in* 62 A.B.A. J. 517, 521 (1976). The government stresses that it declined to waive disqualification in this case. In *Kesselhaut*, however, we ruled that

> the consent of the adverse party would not necessarily compel our assent to a flagrant conflict of interest, nor, on the contrary, should the withholding of consent by the Government, as here, be binding on us if, as here, it appears now to be unjustified, whether or not it may have been justified initially. Parties can be heard on apparent conflicts of interests on the part of adversary counsel, but they cannot be allowed to debase the matter into another phase of adversary tactics.

214 Ct.Cl. at 129, 555 F.2d at 794. We reaffirm that ruling.

■ In *Kesselhaut* we recognized that "[t]here will be instances where no screening procedure will be adequate, and the infection must be allowed to take its course." 214 Ct.Cl. at 128, 555 F.2d at 793. The Second Circuit in *Armstrong* similarly noted that "there may be unusual situations where the 'appearance of impropriety' alone is sufficient to warrant disqualification." 625 F.2d at 446. But because of the serious impact disqualification has upon both the litigant, who is denied counsel of his choice, and the firm itself, disqualification because of the appearance of impropriety would be appropriate only in a clear and compelling case. The present case, where the claim of an appearance of impropriety rests upon suspicion and rhetoric and is not supported by the actual facts, does not call for disqualification.

Accordingly, the government's request for interlocutory review is granted, and the order of the trial judge refusing to disqualify the law firm of Weissburg and Aronson, Inc., is affirmed.