**Lloyd A. KADISH and Peter Berman, Plaintiffs,**

v.

**COMMODITY FUTURES TRADING COMMISSION, Defendant.**

**No. 82 C 3387.**

United States District Court, N.D. Illinois, E.D.

Sept. 23, 1982.

Supplemental Memorandum Opinion and Order Oct. 13, 1982.

Royal B. Martin, Jr., Shelly B. Kulwin, Silets & Martin, Ltd., Chicago, Ill., for plaintiffs.

Adrianne S. Harvitt, Constantine Gekas, Chicago, Ill., Kenneth Raisler, Helen Blechman, Washington, D.C., Commodity Futures Trading Com'n, for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Lloyd Kadish ("Kadish") and Peter Berman ("Berman") sue Commodity Futures Trading Commission ("CFTC") for a declaratory judgment authorizing Silets & Martin, Ltd. ("Silets & Martin") to represent Kadish and Berman in a separate subpoena enforcement action CFTC has brought against them.[1] CFTC has moved for summary judgment, seeking disqualification of Silets & Martin as a matter of law. For the reasons contained in this memorandum opinion and order, CFTC's motion is denied.

### Facts[2]

On Sunday, October 26, 1980 John Dolkart ("Dolkart"), a senior trial attorney with CFTC, was working in its Chicago offices, preparing for a business trip the following day. CFTC Regional Counsel Constantine Gekas ("Gekas") came in and told Dolkart Chicago Discount Commodity Brokers ("CDCB") was in financial difficulty. Gekas then invited Dolkart into his office and introduced Dolkart, via speaker phone, to John Cotton and an unidentified staff attorney at CFTC's Washington, D.C. Division of Enforcement.

During the ensuing four-sided conversation Gekas said Kadish was counsel for CDCB and asked what Dolkart knew about Kadish. Dolkart responded Kadish was "sharp" and CFTC would need to proceed cautiously with Kadish representing CDCB. All four then engaged in a discussion in principle as to the advisability of moving against CDCB by federal court injunctive

---

1. Both actions are before this Court.

2. As always on a summary judgment motion, the version of the facts tendered by the party moved against, Silets & Martin, is credited so long as appropriately supported in an evidentiary sense. All reasonable factual inferences are drawn in favor of Silets & Martin as well.

action rather than through administrative proceedings. Dolkart opined that from the public's perception neither posed any particular advantage when a registrant like CDCB becomes insolvent. Then Dolkart excused himself from the discussion.

Later the same day Gekas again visited Dolkart's office, this time to ask that Dolkart prepare an injunctive complaint for use by CFTC against CDCB. Dolkart prepared a "boilerplate" complaint by "cutting and pasting" portions of pleadings in prior CFTC cases. Although his draft Complaint contained no factual information as to CDCB, Dolkart told Gekas the relevant facts could be gleaned from public filings in CFTC's office and then aided Gekas in obtaining those files (though Dolkart did not review them before giving them to Gekas). CFTC's subsequent order of investigation in the CDCB matter, a private document not available to the public, named Dolkart as one of three regional employees designated to conduct an investigation of CDCB's activities.

After that initial activity, Dolkart was not in any way involved in the later CDCB investigation. However, in April 1981 Dolkart assisted another CFTC staff attorney, Adrianne Harvitt ("Harvitt"), in CFTC's subpoena enforcement action against CDCB's accountant David B. Dahl. Dolkart's activity took two forms:

1. Dolkart briefly discussed with Harvitt the federally recognized accountant-client privilege, though not in relation to specific facts regarding Dahl and CDCB.

2. Dolkart accompanied Harvitt to court for her April 29, 1981 argument of a motion in the CDCB matter. Dolkart did not participate in Harvitt's preparation or argument. Instead he was with Harvitt solely to "hold her hand," because she was both new to the Division of Enforcement and generally inexperienced.

Dolkart left CFTC June 12, 1981 and began work as an associate with Silets & Martin three days later. In December 1981 Kadish and Berman, who had received CFTC administrative subpoena duces tecum in its CDCB investigation, retained Silets & Martin to represent them.

Before meeting with Kadish and Berman, Royal Martin, Jr. ("Martin") asked Dolkart to work on the matter. Dolkart described his earlier "peripheral exposure" to Martin. Martin then decided Silets & Martin *could* represent Kadish and Berman but "pursuant to our general firm policy, Dolkart should not be involved in the matter." Martin invited another associate, Shelly Kulwin ("Kulwin"), into his office (with Dolkart still present) and said (1) Martin and Kulwin would work on the Kadish and Berman matter and (2) Dolkart "was to be completely excluded from participation in the case." Martin, Dolkart and other firm members and associates have filed affidavits attesting to their adherence to that exclusion. Of course Dolkart, as an associate, does not share in the firm's fees from representing Kadish and Berman.

### Standards Governing Disqualification

In the decision of any disqualification motion, this Court's first line of inquiry is addressed to the American Bar Association ("ABA") Code of Professional Responsibility (the "Code"). This District Court has adopted the Code as an appropriate guideline for the conduct of attorneys admitted to practice before it (General Rules 6(a)(i)), and our Court of Appeals has regularly relied upon it in the disqualification area. *See, e.g., Novo Terapeutisk Laboratorium A/S v. Baxter Travenol Labs, Inc.,* 607 F.2d 186, 189 (7th Cir. 1979); *Westinghouse Electric Corp. v. Gulf Oil Corp.,* 588 F.2d 221, 224, 228 (7th Cir. 1978).

Under the circumstances of this case a two-level analysis is called for. First this Court must determine whether Dolkart could represent Kadish and Berman. If not—and this opinion concludes that he cannot—it must be separately decided whether Dolkart's disqualification extends vicariously to Silets & Martin.

### Dolkart's Individual Disqualification

Little difficulty is posed by the first issue of Dolkart's personal disqualification. Code Disciplinary Rule ("DR") 9–101(B) states:

A lawyer shall not accept private employment in a matter in which he had substantial responsibility while he was a public employee.

There is no real question the current "matter" is the same one (the CDCB litigation) Dolkart worked on at CFTC. Rather Silets & Martin argue Dolkart's involvement in that matter was so "peripheral, clerical and formal" that he cannot be said to have had "substantial responsibility" for it.

■ ABA Formal Opinion 342[3] defined "substantial responsibility" as:

a responsibility requiring the official to become personally involved to an important, material degree, in the investigative or deliberative processes regarding the transactions or facts in question.

Some difference of views exists on whether "personally involved" means actually participating—as contrasted with mere knowledge by a lawyer in a supervisory position. See Ass'n of the Bar of the City of New York Opinion No. 889, 31 Record 552, 557–58 (1976). But there can be no doubt that Dolkart was "personally involved" in the CDCB litigation in either sense.

That conclusion is compelled by Dolkart's having drafted CFTC's injunctive complaint, together with his other limited involvement already described. True enough his drafting did not embrace knowledge of the particular facts of the CDCB case. But that is not crucial. Dolkart acted as lawyers (in both litigation and transaction practice) so often do at the outset of a matter—putting together a "stock" pleading or form for a client in anticipation of "filling in the blanks" with the applicable details once they become clear.

That activity calls for the kinds of judgment inherent in lawyering. Indeed even the decision that a "boilerplate" complaint of a particular kind will do an adequate job implicates a legal judgment. Lawyers who make such judgments certainly have "substantial responsibility" for the matters upon which they are working, and it is irrelevant that such responsibility does not initially entail immediate application of specific facts to the legal problem at hand. When Dolkart cut and pasted the "boilerplate" pleading he was doing lawyer's work for his client, CFTC, and he stood in a position adverse to CDCB.[4]

As already indicated, the result just expressed is buttressed by Dolkart's other activities, in which he rendered advice and consulted with staff attorneys admittedly more involved with the litigation than he. Cases on which Silets & Martin seek to rely do not support Dolkart's non-disqualification. Thus in *Sierra Vista Hospital, Inc. v. United States,* 639 F.2d 749, 750–51 (Ct.Cl. 1981) the two lawyers found not "substantially responsible" were one who had *no* responsibility for the matter and another who was initially assigned the matter but did *no* work on it before it was reassigned to another attorney. But a third lawyer, James Pyles ("Pyles"), had a position more nearly comparable to Dolkart's: Pyles had drafted one appellate brief in the case, limited to whether the federal district court or the Court of Claims had jurisdiction. His brief never reached the merits of the government's defense. *Sierra Vista* affirmed the refusal to disqualify the other two lawyers because Pyles had been fully screened (even though his current firm was now litigating the merits of the case, with which Pyles was as unacquainted as Dolkart is of the facts regarding CDCB.)

Nor are Silets & Martin assisted by Opinion 111 of the Ethics Committee of the District of Columbia Bar ("Opinion 111"). All the Assistant United States Attorney

---

**3.** ABA's Committee on Ethics and Professional Responsibility issues both formal and informal opinions interpreting Code provisions. Formal Opinion 342 (1975), reprinted in 62 A.B.A.J. 517 (1976), dealt at length with the "swinging door" and related problems presented by successive governmental and private employment of lawyers.

**4.** Though not controlling, it is relevant that DR 9–101(B) is one of three standards within Rule 9–101's caption of "Avoiding Even the Appearance of Impropriety." Without question the mere presence of Dolkart on both sides of the same controversy at different times would create such an appearance of impropriety.

dealt with in Opinion 111 had done was to *read* the first of a series of complaints and to maintain his office's public pleadings file in the cases.[5] Of course such tasks were purely clerical, involving no lawyer's judgment or training.

### Silets & Martin's Non-Disqualification

Dolkart is therefore personally disqualified for the reasons that underpin Canon 9 ("A lawyer should avoid even the appearance of professional impropriety") generally and DR 9–101(B) in particular. That leads in turn to the more difficult question whether principles of infectious disqualification bar Silets & Martin as well.

Literal application of DR 5–105(D) would compel an affirmative answer (emphasis added):

> If a lawyer is required to decline employment under *a disciplinary rule,* no partner, or associate, or any other lawyer affiliated with him or his firm, may accept or continue such employment.

DR 9–101(B) is "a disciplinary rule" for that purpose, so that Dolkart's exclusion would literally bar Silets & Martin too.

■ But both the courts and thoughtful commentators have espoused a less Draconian approach that permits representation by Silets & Martin in the situation presented here. After full consideration this Court has adopted that concept, which serves the important policy of permitting a client's free choice of counsel without doing any violence to other equally important principles of professional responsibility.

Interestingly enough, Illinois has recently addressed this very issue and resolved it in the same way as this opinion. In the Illi-

nois Supreme Court's July 1, 1980 adoption of the Code, it replaced the italicized words in DR 5–105(D) with the words "Rule 5–105." That change was deliberate and motivated by the precise problem now under consideration in this opinion. As stated by the Committee on Professional Responsibility created by the Illinois Supreme Court's Order No. MR 2167 (May 12, 1978) to draft and submit a code for proposed adoption (emphasis in original):[6]

> Finally, in contrast to the ABA rule, the Code *requires* the lawyer's entire firm to be disqualified as a consequence of his personal disqualification only when the personal disqualification is for potential violation of Rule 5–105. Compare Rule 5–105(d) of the present code with DR 5–105(D) of the ABA Code. Thus, if the lawyer's personal disqualification were mandated by some other disciplinary rule, *e.g.,* Rule 9–101, it would not automatically result in disqualification of his firm. These changes are designed to permit discipline of lawyers who violate the spirit of the Code without interfering unnecessarily with the lawyer's functions in today's complex legal setting.

Similarly the Committee's commentary on DR 9–101(B) said:

> It is not the intent of this code that a lawyer's entire firm would be automatically disqualified because of his personal disqualification under Rule 9–101(b). See the discussion of modifications to the ABA's Canon 5, particularly Rule 5–105(d), above. To this extent, the impact of case law interpreting the "appearance of impropriety" standard of the ABA Code is mitigated. The uncertain state of

---

**5.** Opinion 111's statement of the lawyer's non-involvement provides a material contrast to Dolkart's participation while a CFTC lawyer:

> Other than reading the first complaint, the inquirer did not render any advice, take any action nor was he consulted by the Department of Justice or anyone else with respect to the litigation, and at no time did he enter an appearance or appear on any service list in any of the cases. . . .
> He had no occasion to be consulted about any documents, participated in no discussions about any aspect of the cases and did

not render advice or counsel to the government with respect to the handling of the litigation.

**6.** This Court, at that time in private practice, was chairman of a Chicago Bar Association subcommittee on professional responsibility given parallel responsibility by the CBA Board of Managers for providing input to the Supreme Court's Committee. See also this Court's earlier article, Shadur, *Lawyers' Conflicts of Interest: An Overview,* 58 Chi.B.Rec. 190, 194–96 (1977).

this case law is exemplified by *Armstrong v. McAlpin* (2d Cir. 1979), 606 F.2d 28 (petition for rehearing *en banc* granted, Dec. 12, 1979).[7]

Some earlier authority, like ABA Formal Opinion 342 and *Brown v. Board of Zoning Adjustment,* 413 A.2d 1276, 1284 (D.C.App. 1980) held imputed disqualification could be averted if the government waived it and if the disqualified individual lawyer were "effectively screened." But more recent and better reasoned case law has eliminated such a governmental veto power and looked only at the effectiveness of the "screen." *Armstrong v. McAlpin,* 625 F.2d 433, 442–46 (2d Cir. 1980) (en banc), *vacated on other grounds,* 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981); *Sierra Vista,* 639 F.2d at 753; *Kesselhaut v. United States,* 555 F.2d 791, 793 (Ct.Cl.1977) (en banc). As stated in a very recent commentary on the subject, McDavid & McKay, Ex-Government Lawyers Given Freer Rein by Court, Legal Times of Wash. 19 (July 26, 1982):

> To date, the Chinese Wall defense has not been rejected in any case involving a former government attorney, although disqualification has been ordered in cases in which screening was not used.

Like the Illinois Supreme Court, other current code-writers are abandoning the automatic proscription of DR 5–105(B). District of Columbia's Court of Appeals has recently amended DRs 9–101 and 9–102 to avoid imputed disqualification through screening and notification. And Rule 1.11(a) of the new ABA Code (Final Draft of Model Rules of Professional Conduct, as amended at ABA's 1982 annual meeting) does the same.

This Court finds persuasive the approach adopted by the en banc Court of Appeals for the Second Circuit in *Armstrong,* 625 F.2d at 444–45, which focused on the threat of "taint" to the trial process in allowing

the challenged representation.[8] Such a taint would most commonly be created in one of two ways:

(1) where the individual attorney's conflict of interest undermined the court's confidence in the vigor of the firm's representation;

(2) where the firm was at least potentially in a position to use privileged information gained by the individual attorney in his prior representation.

*See Board of Education v. Nyquist,* 590 F.2d 1241, 1246 (2d Cir. 1979).

Neither of those problems exists here. Certainly the first is absent, given the limited scope of Dolkart's prior involvement, his associate status with the firm and his insulation from the firm's handling of the case. As for the second, although Dolkart's early participation was enough to bar him on "substantial responsibility" grounds, it does not appear to have vested him with any privileged information. Even assuming arguendo that it did, however, effective screening would obviate any possible difficulty.

In the latter respect the record on this summary judgment motion is clear. Both Silets & Martin partners, as well as the firm associates, have filed affidavits swearing no interaction with Dolkart on the Kadish and Berman matter. Dolkart has done the same.

CFTC has submitted no evidence even suggesting otherwise. Instead it argues only that the Silets & Martin measures to insulate Dolkart are insufficient. To that end it cites the firm's claimed failure to (1) give instruction to *all* lawyers in the firm, (2) bar Dolkart's access to firm files and (3) separate Dolkart physically from the rest of the office.

CFTC's notions of what are necessary (and realistic) precautions in a small firm environment and on the facts of this case

---

7. As discussed hereafter in the text, upon en banc consideration in *Armstrong,* 625 F.2d 433, 444–45, the Court of Appeals for the Second Circuit announced principles supporting the conclusion reached in this opinion.

8. Our Court of Appeals has not had occasion to comment on the propriety and applicability of the "Chinese wall" concept to a situation like that presented here. *See Westinghouse Electric Corp. v. Kerr-McGee Corp.,* 580 F.2d 1311, 1321 (7th Cir. 1978).

are bizarre. But on this summary judgment motion the Court need not analyze the deficiencies in CFTC's arguments in detail. Suffice it to say that Silets & Martin have certainly submitted sufficient evidence to create *at least* a genuine issue of fact on the effectiveness of the Dolkart screening.

### Conclusion

CFTC's motion for summary judgment on the issue of Silets & Martin's imputed disqualification is denied.

### SUPPLEMENTAL MEMORANDUM OPINION AND ORDER

Less than a week after this Court's September 23, 1982 memorandum opinion and order (the "Opinion") denying the summary judgment motion of CFTC,[1] our Court of Appeals again had occasion (for the first time in some three years) to address the issue of vicarious law firm disqualification. This supplemental opinion, written in light of the decision in *Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715 (1982), reconfirms the conclusion reached in the Opinion.

With all respect, this Court believes *Freeman* did not address itself to a full analysis of the competing considerations in infectious disqualification, especially as highlighted where the "Typhoid Mary"—the lawyer viewed as carrying the taint—has been only an associate in both the first firm and the second firm.[2] In these days of increased lawyer mobility, a broad brush approach to law firm disqualification may be "out of sync" with the applicable public policies. See the discussion in *Silver Chrys-*

*ler Plymouth, Inc. v. Chrysler Motors Corp.,* 518 F.2d 751, 753–54, 756–57 (2d Cir. 1975);[3] Shadur, *Lawyers' Conflicts of Interest: 'An Overview,* 58 Chi.B.Rec. 190, 194–96 (1977).

Yet *Freeman* disposes of one of the controlling issues in that respect in a single footnote (at 723 n.12):

> It will be necessary for the Fitch law firm [the firm to which the associate has moved] to be disqualified should CMI be unable to show that Cohen was not privy to Freeman's confidences and secrets. *See Novo Terapeutisk Laboratorium, Etc. v. Baxter Travenol Lab.,* 607 F.2d 186 (7th Cir. 1979).

Ironically what *Freeman* thus does, after having *rejected* an irrebuttable presumption that the traveling associate knew client confidences and secrets reposed in his *first* law firm (at 722–724), is to *accept* without cavil an irrebuttable presumption that any confidences and secrets he did acquire there were transmitted to his *second* law firm.

That latter problem is after all what has led courts, commentators and code draftsmen to consider and develop the variants of the "Chinese Wall" solution.[4] For the reasons briefly referred to in the Opinion and treated more expansively elsewhere, this Court agrees with the approach adopted by those authorities. Indeed *Novo* itself, with its rejection of the irrebuttable presumption, points in the same direction. If our Court of Appeals is to go against the tide, rejecting that possibility in favor of an irrebuttable presumption of *second* firm disqualification, this Court suggests that the

---

1. All terms defined in the Opinion are used with the same meaning here.

2. This is not to say that the shifting associate problem should generate a different rule from that applicable to admission of a new partner. Both in government and in private practice the lateral transfer to partnership status has become an increasingly frequent phenomenon. But the prospect of upstream disqualification of an entire firm—perhaps a very large one—solely because of its having hired a new young associate presents the issue in its most dramatic form.

3. In *Silver Chrysler* the lawyer who had originally been an associate with a large firm shifted to a new firm in which he was a name partner and was in charge of the disputed litigation. Consequently the fact or imputation of knowledge when he was associated with the first firm would necessarily be conclusive as to disqualification of the second firm.

4. The Opinion (548 F.Supp. at 1034–35) reflects and refers to only a fraction of the thinking and analysis that have gone into the matter by the various parties that have considered and dealt with it.

decision to do so should be a deliberative one.[5]

▮ In any event, even if the statement in *Freeman*'s n.12 is viewed as the law of this Circuit, the result here remains the same. Though Dolkart had "substantial responsibility" within the meaning of DR 9–101(B), he was *not* the repository of governmental "confidences and secrets" within the meaning of Canon 4 and its DR 4–101.[6] Accordingly Silets & Martin are not disqualified from acting for Kadish and Berman under *Freeman*, just as they were held not disqualified under the Opinion.

---

**5.** *Freeman* focused entirely on the first level of disqualification—downstream from the first law firm to the associate—perhaps because the litigants had dwelt exclusively on that issue. Nothing in the *Novo* analysis (607 F.2d at 196–97) even suggests that its rebuttable presumption approach would not be equally applicable to the second level inquiry—upstream from the associate to the second law firm. Unfortunately *Freeman*'s n.12 appears to represent law of the case and not merely dictum, though the Court does not seem to have considered the matter at all.

**6.** There is no anomaly in this conclusion. It stems from the nature of the activity this Court found to constitute lawyering on Dolkart's part. In the ordinary situation "substantial responsibility" carries with it substantive knowledge of the type DR 4–101 defines as "confidences" and "secrets":

"Confidence" refers to information protected by the attorney-client privilege under applicable law, and "secret" refers to other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing to or would be likely to be detrimental to the client.