**Obrad KOVACEVIC, Radovan Kovacevic, and Dragan Ivanovic, Plaintiffs,**

**v.**

**FAIR AUTOMOTIVE REPAIR, INC. and Gayle Wakefield, Defendants.**

**No. 84 C 9371.**

United States District Court, N.D. Illinois, E.D.

July 7, 1986.

ry, without limits as it is, would wreak havoc in the workplace by precluding any semblance of

William Van Hagey, Van Hagey & Bogan, Ltd., Mundelein, Ill., Michael J. Rovell, Carter H. Klein, Robert D. Nachman, Jenner & Block, Chicago, Ill., for plaintiffs.

Robert V. Gildo, Wheaton, Ill., Radovan Kovacevic, Chicago, Ill., for defendants.

**MEMORANDUM OPINION AND ORDER**

NORDBERG, District Judge.

Plaintiffs, Obrad Kovacevic, Radovan Kovacevic and Dragan Ivanovic, filed this

continuity.

action against defendants Fair Automotive Repair, Inc. ("Fair") and Gayle Wakefield, Fair's Chief Executive Officer and major shareholder, for damages and injunctive relief. This dispute arises out of a franchise agreement between plaintiffs and Fair. This matter is now before the court on defendants' "Objections to Motion for Leave to Enter Appearance," which the court hereinafter considers as a motion to disqualify plaintiffs' counsel. For the reasons set forth below, the court denies defendants' motion to disqualify the law firm of Van Hagey and Bogan, Ltd., and grants Van Hagey and Bogan's motion for leave to enter an appearance on behalf of plaintiffs. The Van Hagey and Bogan attorneys appearing on behalf of plaintiffs are William Van Hagey, David C. Bogan and Linda J. Chiron.

## I. Facts

Defendants have moved to disqualify Van Hagey and Bogan based on the alleged conflict of interest of one of its associates, William C. Kurylak. From approximately October, 1977 until February, 1979, and from May, 1979 until November, 1985, Kurylak was an Assistant Attorney General ("A.A.G.") in the Franchise Division of the Illinois Attorney General's Office. As an A.A.G. in the Franchise Division, Kurylak supervised the review of franchisor disclosure statements, handled franchisee complaints, represented the State of Illinois in administrative and judicial proceedings against franchisors, and generally administered the Illinois Franchise Disclosure Act, Ill.Rev.Stat. ch. 121½, ¶ 701 et seq.

In 1985, while an A.A.G. in the Franchise Division, Kurylak received complaints from various Fair franchisees. Thereafter, Kurylak caused an investigative file to be opened to look into Fair's conduct. Kurylak met with current and former Fair franchisees in August, 1985. At this meeting, the franchisees gave Kurylak pleadings from this action, and apprised Kurylak of the issues involved in this action. Kurylak met with Fair's counsel, Gayle Wakefield and Fair franchisees in September, 1985. Those present at that meeting again apprised Kurylak of the issues in, and progress of, this action. Following this second meeting, Kurylak communicated with Fair's counsel, by telephone and correspondence, regarding the renewal of Fair's franchise registration. During those communications, Kurylak received financial information from Fair's counsel, which Kurylak agreed to keep confidential. The Attorney General renewed Fair's franchise registration in November, 1985.

On January 2, 1986, Kurylak joined the law firm of Van Hagey and Bogan as a salaried associate. In late May, 1986, one of Fair's former franchisees contacted Van Hagey regarding Van Hagey and Bogan's possible representation of Fair franchisees in this and other actions. Van Hagey and Bogan planned to meet with the franchisees to discuss possible representation. Prior to meeting with the franchisees, however, Van Hagey informed Kurylak that Van Hagey and Bogan would be meeting with the franchisees to discuss representation in this and other actions. At that time, Kurylak told Van Hagey that, while he was an A.A.G. in the Franchise Division, he had been involved in a dispute between Fair and its franchisees and had been aware of this litigation. Kurylak did not, and has not, told Van Hagey what he discussed with Fair and its franchisees in the 1985 meetings, telephone conversations or other communications.

During that conversation, Van Hagey and Kurylak agreed to build a "Chinese wall" around Kurylak. Van Hagey and Kurylak agreed that: (1) Kurylak would have no involvement in the Fair litigation; (2) Kurylak would not discuss with anyone at Van Hagey and Bogan the information Fair provided to him while he was an A.A.G.; (3) Van Hagey and Bogan lawyers and staff would not discuss the Fair litigation with Kurylak; (4) Kurylak would have no contact with any of the plaintiff franchisees in this action; (5) Kurylak would not have access to any information regarding the case; and (6) Kurylak would have no contact with the Attorney General's Office regarding Fair. Both Kurylak and

Van Hagey have submitted affidavits attesting to this "Chinese wall" under penalty of perjury.

On June 18, 1986, Van Hagey and Bogan filed its motion for leave to appear on behalf of the plaintiffs in this case. On June 24, 1986, plaintiffs' former counsel, Jenner and Block, moved to withdraw as counsel for plaintiffs based on irreconcilable differences that had developed between Jenner and Block and the plaintiffs regarding the manner in which the litigation was to proceed. On June 24, 1986, defendants filed their objections to Van Hagey and Bogan's motion for leave to enter an appearance on behalf of plaintiffs.

Defendants contend that Kurylak has a clear conflict of interest, and that his appearance in this action would violate Canon 9 of the American Bar Association's ("ABA") Code of Professional Responsibility ("Code") and Disciplinary Rule ("D.R.") 9–101(B) under Canon 9. Canon 9 provides that "[a] lawyer should avoid even the appearance of professional impropriety." D.R. 9–101(B) states:

> A lawyer shall not accept private employment in a matter in which he had substantial responsibility while he was a public employee.

According to defendants, Kurylak's appearance would violate these provisions because: (1) as an A.A.G., Kurylak held a "quasi-judicial" status, since the Attorney General determines whether to grant, maintain or withdraw franchise rights; (2) as an A.A.G., Kurylak received confidential information and agreed to keep that information confidential; and (3) Kurylak advised Fair to place in escrow fees collected from existing and future franchisees, as a condition precedent to the renewal of its franchise registration, thereby weakening Fair's cash position and making Fair "less able to defend [this] litigation." Also, defendants contend that, because of Kurylak's former position, "he ought to become a witness for the defendants herein with respect to the contested issues, thereby placing him in jeopardy of violating [D]isciplinary [R]ule 5–101(b)."

As for the appearance of the firm of Van Hagey and Bogan, defendants contend that, where one member of a firm has a conflict of interest, it is improper for any member of the firm to participate in the matter. Also, defendants argue that they will experience substantial prejudice if Van Hagey and Bogan is allowed to appear because Kurylak will reveal confidential information about Fair to other Van Hagey and Bogan personnel intentionally or by inadvertence and Kurylak will have enhanced credibility with the Illinois Attorney General, having been an employee.

Plaintiffs contend, on the other hand, that defendants' objections to Kurylak's appearance are inappropriate because Kurylak has not sought, and will not seek, to enter an appearance on behalf of plaintiffs in this action. Plaintiffs also argue that Van Hagey and Bogan should not be vicariously disqualified, because it instituted, in a timely fashion, strict protective measures to screen Kurylak from involvement in this case, thereby dispelling any potential appearance of impropriety.

Plaintiffs, in response to defendants' other arguments, contend that: (1) the allegedly confidential information that Fair disclosed to Kurylak is not relevant to the issues in this case, and, in any event, all of the materials Fair gave the Attorney General are open to public inspection or attainable by subpoena under Ill.Rev.Stat. ch. 121½ ¶ 732; (2) defendants' argument about Kurylak's enhanced credibility with the Illinois Attorney General is misplaced, as the Attorney General is not a party to, or involved in, this action; (3) Kurylak did not have a "quasi-judicial" status as an A.A.G., but merely administered the Illinois Franchise Disclosure Act without approving or adjudging franchisors or their disclosure statements; (4) defendants' contention that Kurylak will be a witness is disingenuous because defendants did not call Kurylak as a witness during the preliminary injunction hearing in this case or the month long jury trial in a related case, and, in any event, Kurylak has no direct knowledge of any facts underlying the claims or defenses

in this case; and (5) Van Hagey and Bogan's appearance in this action will not prejudice defendants, but disqualification of Van Hagey and Bogan would prejudice plaintiffs, as this is an ongoing, complex franchise case, and Van Hagey and Bogan attorneys have expertise in this area and are willing to represent plaintiffs.

## II. The "Chinese Wall" Doctrine

Before delving into the disqualification analysis, the court stresses that this case involves a former government attorney whose firm wishes to represent a private litigant in a suit against another private litigant. The former government attorney's agency is not a part to, or involved in, this action. Therefore, the alleged "appearance of impropriety" stems only from the possible use of confidential information the attorney acquired while in government office. This case does not present the situation in which a former government attorney represents a private litigant in a suit by, against, or before his former "client," the agency.[1] Having made this clarification, the court now begins its disqualification analyses with an examination of the ABA's Code and Model Rules of Professional Conduct ("Rules").

Both the ABA Code and Rules contemplate a two-step analysis in cases such as this. First, the court must determine whether the former public employee may represent the private litigant; if not, the court must then determine whether that attorney's disqualification extends vicari-

ously to his or her firm.[2] *Kadish v. Commodity Futures Trading Commission,* 548 F.Supp. 1030, 1032 (N.D.Ill.1982).

### A. Kurylak's Disqualification

Disciplinary Rule 9–101(B), set out above, establishes the ABA Code standard for disqualification of the former public employee. Under 9–101(B), a former government attorney cannot accept private employment in a matter in which he had "substantial responsibility" while he worked for the government. The ABA has defined "substantial responsibility" as "a responsibility requiring the official to become personally involved to an important, material degree, in the investigative or deliberative processes regarding the transactions or facts in question." ABA Committee on Ethics and Professional Responsibility, Formal Opinion 342 (1975), 62 A.B.A.J. 517, 520 (1976).

In *Kadish,* the court found that John Dolkart, a former Commodity Futures Trading Commission ("CFTC") attorney, had had "substantial responsibility" in a matter concerning the Chicago Discount Commodity Brokers ("CDCB") while at the CFTC. Dolkart had briefly discussed with other CFTC attorneys the strategy of the CFTC's case against CDCB, drafted a "boilerplate" injunctive complaint against CDCB for the CFTC, and accompanied another CFTC attorney to court to hear her argue a motion in the CFTC's case against CDCB. The court found that Dolkart had "substantial responsibility" in the CDCB

1. Therefore, the three-part "substantial relationship" test for disqualification of an attorney who undertakes litigation against a former client does not apply in this case. *See, e.g., Lueders v. Lehman Brothers Kuhn Loeb, Inc.,* —— F.Supp. —— No. 83 C 371 slip op. at 55–57 (N.D.Ill. June 19, 1986); *Kadish v. Commodity Futures Trading Commission,* 548 F.Supp. 1030 (N.D.Ill.1982). *See also Analytica, Inc. v. NPD Research, Inc.,* 708 F.2d 1263, 1266–67 (7th Cir. 1983); *LaSalle National Bank v. County of Lake,* 703 F.2d 252, 255–57 (7th Cir.1983); *Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715, 721–22 (7th Cir.1982); *Novo Terapeutisk Laboratorium v. Baxter Travenol Laboratories, Inc.,* 607 F.2d 186, 195 (7th Cir.1979) (en banc); *Westinghouse Electric Corp. v. Gulf Oil Corp.,* 588 F.2d 221, 223–25 (7th Cir.1978). However, cases involving the "substantial relationship" test, to the

extent that they also discuss the vicarious disqualification of the attorney's firm, are instructive. *See Analytica,* 703 F.2d at 1267; *LaSalle,* 703 F.2d at 257–59; *Freeman,* 689 F.2d at 723 n. 12; *Novo,* 607 F.2d at 196–97.

2. Plaintiffs contend that Kurylak's disqualification is irrelevant, because Kurylak does not, and will not, seek to enter an appearance for plaintiffs. However, defendants seek to disqualify Van Hagey and Bogan on a vicarious disqualification theory, and disqualification of Kurylak is a prerequisite to the vicarious disqualification of Kurylak's firm. *See ABA Code D.R. 5–105(D); ABA Rule 1.11.* Therefore, the court must first consider whether Kurylak may represent plaintiffs in this action.

matter because his actions, particularly the drafting of the complaint, involved legal judgment and training. *Kadish,* 548 F.Supp. at 1033.

 Under *Kadish* and the ABA's definition, it is clear that Kurylak had "substantial responsibility," while an A.A.G., regarding the dispute between Fair and its franchisees. Kurylak heard all of the complaints of Fair's franchisees that form the basis of this suit, opened an investigative file on Fair to look into those complaints, and met with Fair and its franchisees regarding the complaints. Kurylak was therefore personally involved in, and primarily responsible for, the investigation of Fair. Certainly, Kurylak involved himself with the facts of the Fair franchisee dispute more than Dolkart involved himself with the facts in the CFTC's investigation of, and suit against, the CDCB. *See Kadish,* 548 F.Supp. at 1031–32. The court therefore finds that Kurylak had "substantial responsibility" in the Fair matter, and, pursuant to D.R. 9–101(B), Kurylak may not represent plaintiffs in this matter.

Just as the Seventh Circuit has relied on the ABA Code,[3] *see, e.g., LaSalle,* 703 F.2d at 258; *Novo,* 607 F.2d at 197; and *Westinghouse,* 588 F.2d at 228, it has also relied on the more recent ABA Rules in matters of ethics and professional responsibility, *see, e.g., Darl "Hunk" Havens v. State of Indiana,* 793 F.2d 143, 144 (7th Cir.1986) (Rule 1.9); *United States v. Marrera,* 768 F.2d 201, 204 n. 5 (7th Cir.1985) (Rule 1.8(d)), *cert. denied,* — U.S. —, 106 S.Ct. 1209, 89 L.Ed.2d 321 (1986); *United States v. Gutman,* 725 F.2d 417, 430 (7th Cir.1984) (Coffee, J., dissenting) (Rule 3.8), *cert. denied,* 469 U.S. 880, 105 S.Ct. 244, 83 L.Ed.2d 183 (1984); *Caruth v. Pinkney,* 683 F.2d 1044, 1049 (7th Cir.1982) (Rule 8.1), *cert. denied,* 459 U.S. 1214, 103 S.Ct. 1212, 75 L.Ed.2d 451 (1983); *English v.*

*United States,* 620 F.2d 150, 151 n. 3 (7th Cir.1980) (Rule 1.10(a)), *cert. denied,* 449 U.S. 859, 101 S.Ct. 160, 66 L.Ed.2d 75 (1980). ABA Rule 1.11, concerning successive government and private employment, provides in relevant part:

(a) Except as law may otherwise expressly permit, a lawyer shall not represent a private client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government agency consents after consultation. No lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter unless:

(1) the disqualified lawyer is screened from any participation in the matter and is apportioned no part of the fee therefrom; and

(2) written notice is promptly given to the appropriate government agency to enable it to ascertain compliance with the provisions of this rule.

(b) Except as law may otherwise expressly permit, a lawyer having information that the lawyer knows is confidential government information about a person acquired when the lawyer was a public officer or employee, may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person. A firm with which that lawyer is associated may undertake or continue representation in the matter only if the disqualified lawyer is screened from any participation in the matter and is apportioned no part of the fee therefrom.

The ABA Rule, then, replaces the Code's "substantial responsibility" test with a "personal and substantial participation" test.[4] As set forth above, the court finds

---

**3.** In *Kadish,* the court referred to General Rule 6(a)(i) of the Northern District of Illinois, which adopted the ABA Code as an appropriate guideline for the conduct of attorneys admitted to practice before the district courts of the Northern District of Illinois. However, on July 12, 1982, the District Court vacated General Rule 6.

**4.** The ABA so modified D.R. 9–101(B) because courts interpreted "substantial responsibility" to disqualify government attorneys with supervisory positions from private employment with respect to any matter arising during that lawyer's tenure as a supervisor. ABA, *Annotated Model Rules of Professional Conduct* 131 (1984).

that Kurylak personally participated in, even directed, the Fair investigation. Under both the ABA Code and Rules, therefore, Kurylak may not represent plaintiffs in this action.

## B. Van Hagey and Bogan's Disqualification

Having disqualified Kurylak from representation of plaintiffs, the court must now determine whether Van Hagey and Bogan should be vicariously disqualified. D.R. 5–105(D) of the ABA Code provides:

> Rule 1.11 sets out more specifically the circumstances in which concern for public confidence in government necessitates disqualification of a lawyer. *Id.*

**5.** As highlighted in *Kadish*, Illinois' version of D.R. 5–105(D) disqualifies a firm when one of its lawyers is required to decline employment under D.R. 5–105, only, not under all disciplinary rules. Ill.Rev.Stat. ch. 110A, Rules of the ARDC, Article VIII, Rule 5–105(d) (1985). The intended effect of this variation from the ABA's version of D.R. 5–105(D) is the prevention of automatic disqualification of a law firm when D.R. 9–101(B) mandates a lawyer's personal disqualification. Ill.Rev.Stat. ch. 110A, Rules of the ARDC, Article VIII, Canon 5, Comments of the Committee on Professional Responsibility at 718 (1985). *See In Re Marriage of Thornton,* 138 Ill.App.3d 906, 917, 93 Ill.Dec. 453, 486 N.E.2d 1288 (1985) ("The present Illinois Code requires that, at least insofar as former government attorneys are concerned, the only instances in which the attorney's entire firm is automatically disqualified is where the attorney is personally disqualified for conflict of interest under Rule 5–105(d).")

The court notes, as an aside, that Illinois' version of 9–101(B) does not mandate Kurylak's disqualification, as does the ABA version. Illinois' Rule 9–101(b) provides:

> Unless he is bound by a stricter standard imposed by the public body, a lawyer who leaves public employment shall not appear in the capacity of a lawyer *before the public body by which he was employed* on a matter in which during the public employment the lawyer participated personally and substantially or which was under his official responsibility.

Ill.Rev.Stat. ch. 110A, Rules of the ARDC, Article VIII, Rule 9–101(b) (1985) (emphasis added). This suit is obviously before this court, and not the Illinois Attorney General; therefore, Illinois' 9–101(b) does not expressly require Kurylak's disqualification.

**6.** In Formal Opinion 342 (1975), the ABA Committee on Ethics and Professional Responsibility stated:

If a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner, or associate, or any other lawyer affiliated with him or his firm, may accept or continue such employment.

Read literally, D.R. 5–105(D) would disqualify Van Hagey and Bogan from representation of plaintiffs in this action. However, many courts and commentators, including the Illinois Attorney Registration and Disciplinary Commission ("ARDC"),[5] and the ABA itself,[6] have "espoused a less Draconi-

> Accordingly, it is our opinion that whenever the government agency is satisfied that the screening measures will effectively isolate the individual lawyer from participating in the particular matter and sharing in the fees attributable to it, and that there is no appearance of significant impropriety affecting the interests of the government, the government may waive the disqualification of the firm under D.R. 5–105(D). In the event of such waiver, and provided the firm also makes its own independent determination as to the absence of particular circumstances creating a significant appearance of impropriety, the result will be that the firm is not in violation of D.R. 5–105(D) by accepting or continuing the representation in question.

62 A.B.A.J. at 521. The ABA Committee so interpreted D.R. 5–105(D) after balancing the competing interests behind D.R. 5–105(D). On the one hand, if past government employment results in the disqualification of future employers, government lawyers may be regarded as "Typhoid Marys," and the government may find it difficult to recruit talented attorneys. 62 A.B.A.J. at 520. *See also LaSalle,* 703 F.2d at 258; *Freeman,* 689 F.2d at 723 n. 11. Also, litigants should not be unreasonably limited in their selection of skilled and trained attorneys. 62 A.B.A.J. at 520. On the other hand, "confidential information should be safeguarded, and government lawyers should be discouraged from handling particular assignments in such a way as to encourage their own future employment in regard to those particular matters after leaving government service." *Id.* Also, and more fundamentally, courts and the attorneys practicing before them should preserve the public's regard for the legal profession. *Freeman,* 689 F.2d at 723.

According to the ABA Committee, their interpretation of D.R. 5–105(D), allowing a disqualified attorney's firm to represent a litigant as long as the government consented and the firm screened the attorney, struck a proper balance between these competing policies. While this court acknowledges the import of these compet-

an approach" to D.R. 5–105(D). *Kadish,* 548 F.Supp. at 1034. Some earlier authority adopted the position that, if the government waives a firm's vicarious disqualification, and the firm "effectively screens" the disqualified individual lawyer, the firm can thereby avert vicarious disqualification. *See supra* n. 6. However, more recent authority eliminates the requirement · of governmental consent, holding that effective screening alone may prevent vicarious or imputed disqualification. *Kadish,* 548 F.Supp. at 1035. *See* ABA, *Annotated Model Rules of Professional Conduct* 133 (1984), and cases cited therein.

The ABA Rules adopt such a position in Rule 1.11, set forth above. Under Rule 1.11(a), governmental consent is required only when the former government attorney wishes to represent a private litigant. Should the attorney's firm wish to represent the private litigant, it need only notify the appropriate government agency, in addition to screening.

The Seventh Circuit has adopted, albeit in dicta, the position expressed in ABA Rule 1.11. At the time *Kadish* was decided, the Seventh Circuit had yet to comment on the applicability of the "Chinese wall" doctrine to D.R. 5–105(D) cases. *Kadish,* 548 F.Supp. at 1035 n. 8. However, shortly after *Kadish,* the Seventh Circuit rejected the "Chinese wall" doctrine by implication

in a brief footnote without discussion. *Freeman,* 689 F.2d at 723 n. 12.

In *Freeman,* an attorney who had worked for the plaintiff's law firm moved to a new firm which the defendants later retained. While at the plaintiff's firm, the attorney did not work on, or have knowledge of, the *Freeman* litigation. The Seventh Circuit applied the "substantial relationship" test. *See supra* n. 1. Although it found the subject matter of the former representation substantially related to the subject matter of the subsequent representation, the court held that the presumption that the attorney shared in plaintiff's confidences and secrets while at his former firm was rebuttable. *Freeman,* 689 F.2d at 723. The court remanded the case, directing the district court to consider whether defendants had rebutted the presumption with clear, effective, uncontroverted affidavits. *Freeman,* 689 F.2d at 723.

In its directions to the district court, the *Freeman* court cryptically stated:

It will be necessary for the [defendant] law firm to be disqualified should [defendants] be unable to show that [the attorney] was not privy to [plaintiff's] confidences and secrets. *See Novo* . . . . [7]

*Freeman,* 689 F.2d at 723 n. 12. Thus, the court did not consider, and by implication rejected, the possibility of a screen to prevent the vicarious disqualification of the

---

ing policies, it finds, as does the ABA in its more recent Rule 1.11(a), that governmental consent to firm representation is not necessary to balance the competing policies, and, in fact, gives the government unlimited "veto power" over a litigant's choice of counsel. *See Kadish,* 548 F.Supp. at 1035. *See also infra* text at p. 244.

7. With all due respect, this court finds that the Seventh Circuit's *en banc* decision in *Novo* does not support this proposition. In *Novo,* defendant's attorney left his law firm, but kept defendant as his client. Plaintiffs later retained the attorney's former law firm. In its *en banc* opinion, the Seventh Circuit affirmed the district court's order denying defendant's motion to disqualify plaintiff's counsel. In so holding, the court found rebuttable the presumption that defendant's attorney shared defendant's confidences with members of his former firm while an attorney there. *Novo,* 607 F.2d at 196–97. The court did not consider, nor, under the facts in

*Novo,* did it need to consider, whether the presumption that an attorney will share confidences with his second firm is rebuttable with proof of an effective screen and governmental consent or notice.

Indeed, if anything, *Novo's* holding lends support by analogy to adoption of the "Chinese wall" doctrine. The presumption that an attorney shared information and client confidences with members of his former law firm is indistinguishable in all relevant aspects from the presumption that he shared such with his second law firm. The *Novo* court's allowance of rebuttal to the first presumption, through affidavits of the attorneys stating they did not receive information or client confidences, leads logically to allowance of rebuttal of the second presumption, through affidavits stating that the firm has effectively screened the attorney from participation in the matter.

attorney's second firm. This court finds *Freeman's* "broad brush approach" to law firm disqualification inappropriate, as did the *Kadish* court in its Supplemental Opinion. *Kadish,* 548 F.Supp. at 1036 ("Ironically, what *Freeman* thus does, after having *rejected* an irrebuttable presumption ..., is to *accept* without cavil an irrebuttable presumption that any confidences and secrets [the attorney] did acquire [at his first firm] were transmitted to his *second* law firm. (emphasis in original)).

The Seventh Circuit itself has rejected, in dicta, *Freeman's* "broad brush" approach to vicarious disqualification. *Analytica,* 708 F.2d at 1267; *LaSalle,* 703 F.2d at 257–59. In *LaSalle,* a former Lake County Assistant State's Attorney ("ASA") joined the law firm of Rudnick and Wolfe. Rudnick and Wolfe later filed suit on behalf of two of its clients against Lake County. Applying the "substantial relationship" test, the court found that a substantial relationship existed between the subjects of the former and subsequent representation, and the former ASA was therefore properly disqualified from representation of the plaintiffs. *LaSalle,* 703 F.2d at 255–57.

As for Rudnick and Wolfe's vicarious disqualification, the court considered whether the presumption that the ASA shared information with other Rudnick and Wolfe attorneys could be rebutted with proof that the ASA was screened from all participation in, and information about, the case against Lake County. The court noted the policy behind the "Chinese wall" doctrine, and examined cases from other circuits and commentaries adopting the doctrine. The court held, without clearly adopting the "Chinese wall" doctrine,[8] that, in any event, Rudnick and Wolfe did not institute its screening arrangement in a timely fashion, and the entire firm was

therefore properly disqualified. *LaSalle,* 703 F.2d at 257–59.

In *Analytica,* a law firm, not just one attorney, switched sides in a litigation matter. The Seventh Circuit noted, in dicta, that the "substantial relationship" test does not mandate vicarious disqualification of an entire firm where effective measures are taken to prevent the new attorney from revealing confidences or information that the attorney obtained while at his former law firm. *Analytica,* 708 F.2d at 1267.

■ This court now holds, relying on the Seventh Circuit's direction in *LaSalle* and *Analytica,* and ABA Rule 1.11, that effective screening of a former government attorney from participation in a case concerning a matter in which he participated personally while working for the government may avert the vicarious disqualification of the attorney's law firm. To be "effective," the screen should prevent the former government lawyer from: (1) gaining access to the case files; (2) sharing in the profits or fees derived from the representation; (3) discussing the suit with any of his firm's attorneys or staff members; and (4) reviewing any of the case documents. *LaSalle,* 703 F.2d at 259. In addition, under ABA Rule 1.11, the law firm should promptly give written notice to the appropriate government agency to enable it to ascertain compliance with the ABA Rules. Furthermore, the law firm should institute all of these measures as soon as the potentially disqualifying event occurs, whether it be when the attorney first joins the firm or when the firm accepts a case in which the attorney was involved previously. *LaSalle,* 703 F.2d at 259. Finally, the disqualified attorney and his law firm should attest to the screening procedures under oath. *Id.*

In this case, Kurylak and Van Hagey submitted affidavits attesting to the "Chinese wall" Van Hagey and Bogan has set

---

**8.** The *LaSalle* court's statement in note 3, "Nevertheless, we believe that *timely* screening arrangements are essential to the avoidance of firm disqualification," is the court's strongest statement regarding adoption of the "Chinese wall" doctrine. *LaSalle,* 703 F.2d at 259 n. 3

(emphasis in original). Although the court did not adopt the doctrine outright, it clearly found it preferable to a strict interpretation of D.R. 5–105(D) in its analysis. *LaSalle,* 703 F.2d at 258–59.

up to screen Kurylak from involvement in this action. Under this arrangement, Kurylak may not discuss the case with other attorneys at Van Hagey and Bogan, the Attorney General, or any of the Fair Franchisees Van Hagey and Bogan seeks to represent. Kurylak is also prevented from gaining access to the case files. Van Hagey and Bogan promptly set this arrangement up before it met with, and decided to represent, the plaintiffs in this action. The court finds this screen effective to prevent the vicarious disqualification of Van Hagey and Bogan in this matter, as long as Kurylak and Van Hagey and Bogan further agree under oath that they will notify the Illinois Attorney General of the situation and the screen they have instituted, and that Kurylak will not share in the profits or fee derived from representation of the plaintiffs in this action.

### Conclusion

For the reasons set forth above, the court denies defendants' motion to disqualify plaintiffs' counsel. Plaintiffs' counsel must file a supplemental affidavit in accordance with the above ruling.