Abe **DWORKIN** and Ada Sylvia Dworkin

v.

**GENERAL MOTORS CORPORATION.**

Civ. A. No. 95-2695.

United States District Court, E.D. Pennsylvania.

Nov. 27, 1995.

Craig Thor Kimmel, Kimmel & Silverman, P.C., Blue Bell, PA, for Plaintiffs.

Peter F. Vaira, Vaira, Backstrom, Riley & Smith, Philadelphia, PA, Steven B. Kantrowitz, McBreen, McBreen and Kopko, Philadelphia, PA, for Defendant.

James Lewis Griffith, Wolf, Block, Schorr and Solis–Cohen, Philadelphia, PA, for Movants.

## MEMORANDUM

CAHN, Chief Judge.

 Plaintiffs Abe Dworkin and Ada Sylvia Dworkin ("Plaintiffs") brought this action against General Motors Corporation ("GM") pursuant to 73 P.S. § 1951–1963, commonly known as the Pennsylvania Lemon Law, among other applicable laws. Currently before the court is GM's motion to disqualify Kimmel & Silverman, P.C. ("K & S") and Jay London, Esquire, ("London") (hereinafter collectively referred to as "Respondents") from representing Plaintiffs in this matter.

GM is a defendant in approximately one hundred lemon law cases pending in this district. In order to avoid inconsistent decisions regarding the issue of disqualification, the parties agreed to designate this case as a test case in which the disqualification issue would be litigated and resolved. Upon consideration of GM's Motion to Disqualify, Respondents' response thereto, all other related briefs and memoranda of law, and after an evidentiary hearing that took place over four separate days, this court finds that Respondents have complied with the Rules of Professional Conduct and should not be disqualified.

## I. Background

The Pennsylvania Lemon Law, the Magnuson–Moss Act, 15 U.S.C. § 2301–2312, and several other statutory schemes give purchasers of defective automobiles the right to sue automobile manufacturers under certain circumstances. These laws will collectively be referred to as "lemon laws" by this court. GM retained the law firms of Lavin, Coleman, Finarelli & Gray ("Lavin") and McBreen, McBreen & Kopko ("McBreen") to defend GM in lemon law suits brought against GM in the greater Philadelphia area. Lavin has represented GM in this capacity since at least 1988, and McBreen has represented GM in lemon law suits since August, 1994. Motion of General Motors Corporation to Disqualify Kimmel & Silverman, P.C. and Jay London, Esquire, from Representing Clients in Suits Against General Motors Corporation in Automobile Warranty Litigation [hereinafter GM Motion to Disqualify], Ex. B, ¶¶ 6, 14 (Affidavit of Laurie N. Adams in

*Steel v. General Motors Corporation,* No. 95–CV–02506 (D.N.J.)).

London was employed as an associate attorney by Lavin from approximately August, 1988 to February, 1993. From approximately March, 1993 to April, 1994 London was employed as an associate attorney by Harvey, Pennington, Herting & Renneisen, Ltd. ("Harvey, Pennington"). From April, 1994 to May 26, 1995, London was employed as an associate attorney by McBreen. During his employment at Lavin and McBreen, London worked on the defense of lemon law cases brought against GM. While at Harvey, Pennington, however, London was not involved in lemon law cases or any other cases involving GM.

While at Lavin, London represented GM in over twenty lemon law matters and billed nearly 1000 hours to GM. GM Motion to Disqualify, Ex. A, ¶ 6 (Affidavit of Francis P. Burns, III in *Steel* case). GM contends that while at Lavin, London was privy to written materials, distributed or approved by GM, that described GM's philosophy and strategy for the defense of lemon law matters. GM further contends that London had frequent contact with GM personnel, specifically GM Legal Assistant Laurie Adams ("Adams"), concerning the defense of GM in lemon law matters.

London joined McBreen in April, 1994 as an associate. In the spring of 1994, London and McBreen partner Steven B. Kantrowitz, Esquire ("Kantrowitz") spoke with Adams to market McBreen's services to GM for the defense of lemon law claims. On August 3, 1994, London and Kantrowitz met with Adams in Detroit to formalize this relationship. GM Motion to Disqualify, Ex. B, ¶ 13 (Adams Aff.). GM avers that a focus of this meeting was to discuss GM's philosophy and strategies for handling lemon law claims filed by K & S. During his employment at McBreen, London defended GM in twenty-nine lemon law claims; in twenty-eight of those matters, the plaintiffs were represented by K & S. *Id.* ¶ 14. GM asserts that London was the only associate at McBreen assigned to represent GM, that London was GM's primary contact person at McBreen, and that Adams had frequent contact with

London, which included discussions of confidential topics.

London resigned from McBreen on Friday, May 26, 1995. On Monday, May 29, 1995 (Memorial Day), London called Robert Silverman ("Silverman") of K & S at Silverman's home. London contends that he had Kantrowitz's permission to call opposing counsel to notify them that he had resigned from McBreen and to request that opposing counsel not take any adverse action during the transition period at McBreen created by London's resignation. During the course of their telephone conversation, Silverman stated that K & S might be interested in hiring London to work on non-GM matters.

On May 31, 1995, London met with Silverman and Craig T. Kimmel ("Kimmel"). London, Silverman, and Kimmel agreed that if an offer were made to London, it would only be after an ethics screen had been implemented, and that London would work exclusively on non-GM matters. After Silverman left the meeting, Kimmel and London created an ethics screen based on a draft London had developed prior to the meeting. On the afternoon of May 31, 1995, Kimmel and Silverman held a meeting of all K & S employees at which the ethics screen was implemented and explained. After this meeting, an offer was made to London via telephone. On June 2, London telephoned Adams, informing her that he had resigned from McBreen and had been offered a position at K & S. London confirmed this telephone conversation with Adams in a letter sent by certified mail the same day. In this letter, London also stated that he wanted to discuss a waiver by GM of any potential conflicts of interest and that a copy of the K & S ethics screen would be available to GM upon request. London accepted the position at K & S on June 2, 1995 and began working at K & S on June 7, 1995. By June 12, 1995 letter, Adams advised London that GM declined to waive any potential conflict of interest and requested a copy of the K & S ethics screen. On June 19, London sent a copy of the K & S

ethics screen policy to Adams via facsimile. On June 20, Adams sent a letter to London advising him that GM had received the ethics screen policy, that GM still declined to waive any potential conflict of interest, and that GM objected to any representation by London or K & S in cases against GM. On June 23, Adams received a letter via facsimile from London in which he proposed a meeting between Adams and K & S to discuss GM's concerns. Adams declined this invitation via a June 26 letter to London, stating that whatever additional information that London wished to supply could be conveyed by writing.

K & S, a small firm [1] with offices in Blue Bell, Pennsylvania and Haddonfield, New Jersey, specializes in lemon law cases against automobile manufacturers, including GM. K & S has brought hundreds of lemon law claims against GM and asserts that there is little, if any, GM strategy or philosophy that K & S has not learned through its extensive experience litigating and settling these claims.

The 10,000–square–foot office space of K & S at Blue Bell contains all client files and includes fourteen separate offices and two conference rooms. Each attorney's office locks and unlocks with a separate key. The particular attorney assigned to an office has that office's only key, with the exception of Silverman, who possesses a master key. Silverman's office consists of a main office and a sub-office, in which all GM files are stored. Whenever Silverman is away from his office, the doors are locked. Each attorney has a personal computer with a personal access code; there is no system network. Silverman reviews all incoming mail and facsimiles for distribution.

## II. Discussion

In this court, the Rules of Professional Conduct (the "Rules") adopted by the Supreme Court of Pennsylvania govern issues of professional conduct, including the present motion to disqualify. U.S.D.C., E.D.Pa., Lo-

---

1. Since London joined K & S, the total number of K & S attorneys has fluctuated between four

cal R.Civ.P. 83.6, R. IV(B).[2] GM alleges that London and K & S should be disqualified pursuant to Rules 1.6, 1.9, and 1.10. This court will analyze GM's claims under these three Rules in turn.

### A. *1.6*

The applicable portions of Rule 1.6 are as follows:

> (a) A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraphs (b) and (c).
>
> . . . .
>
> (c) A lawyer may reveal such information to the extent that the lawyer reasonably believes necessary:
>
> . . . . .
>
> (3) to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim or disciplinary proceeding against the lawyer based upon conduct in which the client was involved, or to respond to allegations in any proceeding concerning the lawyer's representation of the client.
>
> (d) The duty not to reveal information relating to representation of a client continues after the client-lawyer relationship has terminated.

Rules of Professional Conduct Rule 1.6.

 GM correctly asserts that London is obliged to protect all information "relating to the representation" of GM. *Id.* cmt. ("The confidentiality rule applies not merely to matters communicated in confidence by the client but also to all information relating to the representation, whatever its source."). In order to show that London violated Rule 1.6, however, GM must prove that London has actually revealed information relating to the representation of GM. GM's offers of proof as to this issue are testimony from Francis P. Burns, III, a Lavin partner, and expert witness Edward W. Mullinix, senior counsel at Schnader, Harrison, Segal and Lewis.

 Burns testified that the phrase "standardized pleadings, discovery, and releases" that allegedly appears in GM guidelines distributed to London appears verbatim in the affidavit signed by London in *Steel v. General Motors Corporation,* the disqualification action in front of Magistrate Judge Kugler of the United States District Court for the District of New Jersey. Tr., Sept. 21, 1995, at 275–77. Assuming that this exact phrase is used in GM guidelines, this court finds that the use of this innocuous phrase does not amount to the revelation of information relating to the representation of GM, nor will this court draw the inference that the use of this phrase suggests that London has revealed other information relating to the representation of GM.

Mullinix testified that London disclosed that GM desired cost-effective handling of lemon law litigation, that GM· had given McBreen standing settlement authority, that he knew what that settlement authority was, and various other factors relating to his representation of GM during his testimony in the *Steel* case.[3] Tr., Oct. 5, 1995, at 227–29. These statements, although they do relate to the representation of GM, were made in the context of London defending himself against charges of violating the New Jersey Rules of Professional Conduct and, as such, are pro-

and five.

**2.** Although the October 16, 1987 order by which the Supreme Court of Pennsylvania adopted the Rules of Professional Conduct provided that "Any Comments or Comparisons to the Code of Professional Responsibility shall not be a part of the Rules of Professional Conduct," Rules of Professional Conduct (1995) (publisher's note), the comments do "provide guidance for practicing in compliance with the Rules." *Id.* (scope).

**3.** This court has considered Mullinix's testimony regarding London's statements in *Steel.* However, at no time did GM properly submit transcripts for the *Steel* case into evidence. Therefore, this court has not considered references to testimony in the *Steel* case relied upon in General Motors Corporation's Proposed Findings of Fact and Conclusions of Law or the portions of such testimony submitted by GM in its Appendix to General Motors Corporation's Proposed Findings of Fact and Conclusions of Law.

tected by Rule 1.6(c)(3).[4] In short, this court concludes that London has not violated his duty of confidentiality under Rule 1.6.

### B. *Rule 1.9*

■ Rule 1.9 provides:·

A lawyer who has formerly represented a client in a matter shall not thereafter:

(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after a full disclosure of the circumstances and consultation; or

(b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known.

Rules of Professional Conduct Rule 1.9. London clearly "formerly represented" GM in a number of lemon law matters. However, London has not violated Rule 1.9(a), because he is not currently representing any party against his former client.[5] Similarly, London has not violated Rule 1.9(b), because GM has not presented any evidence that London has used information relating to his representation of GM to its disadvantage.[6]

### C. *Rule 1.10*

Rule 1.10 governs issues of imputed disqualification. The relevant provisions of Rule 1.10 are as follows:

(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practic-

ing alone would be prohibited from doing so by Rules 1.7, 1.8(c), 1.9 or 2.2.

(b) When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or a substantially related matter in which that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(b) that is material to the matter unless:

(1) the disqualified lawyer is screened from any participation in the matter and is apportioned no part of the fee therefrom; and

(2) written notice is promptly given to the appropriate client to enable it to ascertain compliance with the provisions of this rule.

Rules of Professional Conduct Rule 1.10.

■ Rule 1.10(a) is not applicable in this case. *See Graham v. Wyeth Lab.*, 906 F.2d 1419, 1422 (10th Cir.1990) (stating that the applicability of Rule 1.10(a) is limited to instances in which "the conflicted lawyer remains with the same firm throughout the prior and current representations"); *see also* Rules of Professional Conduct Rule 1.10 cmt. ("Paragraph (a) operates only among lawyers currently associated in a firm."). In the instant case, London has switched firms, so the situation is governed by Rule 1.10(b). *See Graham*, 906 F.2d at 1422 (stating that "paragraph (b) applies when disqualification of the moving lawyer's new firm is sought"); *see also* Rules of Professional Conduct Rule 1.10 cmt. (stating that paragraph (b) applies

---

**4.** In addition, on cross-examination, Mr. Mullinix admitted that GM never made any objection to any of these "disclosures" by London during the New Jersey proceeding. Tr., Oct. 5, 1995, at 262–63.

**5.** Respondents have also credibly demonstrated that London has no intention of representing clients against GM in the future. *See* Ex. GM–4 (June 2, 1995 letter from London to Adams stating that he would not participate in any case relating to GM while at K & S); Brief of Kimmel & Silverman, P.C. and Jay M. London, Esquire in Support of Their Answer in Opposition to General Motors Corporation's Motion to Disqualify [hereinafter K & S Brief in Support of An-

swer], Ex. C, ¶ 38 (Affidavit of London in *Steel*) ("I have affirmatively represented to General Motors through Laurie Adams that I have not and will not undertake to represent a claimant against General Motors.").

**6.** As noted previously, any disclosures that London may have made in the New Jersey action relating to his representation of GM would in all likelihood be considered "reasonably necessary" pursuant to Rule 1.6(c)(3) to defend the disqualification motion brought in that court. GM has offered no other evidence that London has used any information relating to his representation of GM to GM's disadvantage.

"[w]hen a lawyer moves from one firm to another").

Clearly, London "previously represented" GM, and GM's interests are "materially adverse" to those of clients that K & S represents against GM. In addition, by virtue of London's prior representation of GM, he certainly possesses information "relating to the representation" of GM that would be protected by Rules 1.6 and 1.9(b). Although this court declines to rule on whether such information would be "material" in other lemon law cases or whether lemon law claims are indeed "substantially related," this court will assume that both of these propositions are true for the purposes of this decision.[7]

■ In a Rule 1.10(b) inquiry, the burden of proof is on the firm whose disqualification is being sought. Rules of Professional Conduct Rule 1.10 cmt. In the instant case, Respondents have satisfied their burden to show that London is adequately screened, is apportioned no fee from GM matters, and that written notice was promptly given to GM.

■ The Rules of Professional Conduct and the comments thereto do not provide specific guidance as to what constitutes an effective screen. Although enumerated in a dissenting opinion, this court finds the factors listed by Chief Justice Nix in *Maritrans GP, Inc. v. Pepper, Hamilton & Scheetz,* 529 Pa. 241, 602 A.2d 1277 (1992), to be helpful in analyzing the effectiveness of K & S's ethics screen. These factors include:

1. The substantiality of the relationship between the attorney and the former client

2. the time lapse between the matters in dispute

3. the size of the firm and the number of disqualified attorneys

*Reading Anthracite Co. v. Lehigh Coal & Navigation Co.,* 771 F.Supp. 113, 117 (E.D.Pa.1991) (stating that once a substantial relationship between present and past representations has been established, an "irrebuttable presumption" arises that confidential information relevant to the present dispute might have been obtained through the prior representation).

The decision to examine evidence *in camera* in a disqualification case is a matter within the court's discretion. *See Decora, Inc. v. DW Wallcovering, Inc.,* 899 F.Supp. 132, 138 (S.D.N.Y. 1995) (stating that "the Court has discretion to consider evidence proving either that confidences were or were not communicated in the prior representation and to do so in a manner designed to protect confidential evidence from disclosure"); *Rogers v. Pittston Co.,* 800 F.Supp. 350, 355 (W.D.Va.1992) (stating that "because the moving party is not required to publicly reveal actual confidences, *in camera* submission of documents is a recognized way of establishing that the two matters are substantially related"), *aff'd,* 996 F.2d 1212 (4th Cir.1993). In the instant case, this court suggested an alternative method of protecting GM confidences—the issuance of a confidentiality order that would allow Respondents' counsel to cross-examine GM witnesses regarding the allegedly confidential documents but would protect against further disclosure. Interestingly, GM declined this suggestion, even though the crux of its argument is that London is familiar with these allegedly confidential documents. If London was, in fact, privy to confidential GM documents, this court does not understand why allowing London's counsel to review such documents under a confidentiality order would be troublesome to GM.

---

7. This court makes these assumptions despite substantial evidence to the contrary. For example, Respondents persuasively argue that any information that London may possess relating to his representation of GM would not be material because Silverman has gained extensive knowledge of GM policies and settlement strategies through his experience representing clients against GM in hundreds of lemon law cases. *See* K & S Brief in Support of Answer, at 4. Similarly, Respondents' expert witnesses have testified that in their opinions, the fact-specific nature of lemon law cases renders them not "substantially related." *See* Expert Witness Report of James C. Schwartzman, Esquire, at 11; Expert Witness Report of John Leubsdorf, at 3; *see also Kaminski Bros., Inc. v. Detroit Diesel Allison,* 638 F.Supp. 414, 417 (M.D.Pa.1985) (declining to find a substantial relationship between prior and present representations where there was little likelihood that a law firm "would have or ought to have had discussed or learned of *facts* pertinent to the present litigation" and giving "little weight" to arguments that firm may have been privy to former client's "negotiation techniques or defense theories.").

Because this court assumes for the purposes of this decision that lemon law cases are substantially related, the denial of GM's proffer of allegedly confidential documents for *in camera* review has no bearing on the outcome of this case. *See LaSalle Nat'l Bank v. County of Lake,* 703 F.2d 252, 255 (7th Cir.1983) ("If a substantial relationship is found, it is unnecessary for the movant to prove that the attorney in question actually received during the course of his former employment confidential information relevant to matters involved in the subsequent representation.");

4. the nature of the disqualified attorney's involvement

5. the timing of the wall

*Id.* 602 A.2d at 1289 (citations omitted) (summarizing factors considered by other courts). In addition, the features of the wall itself should be analyzed, including the following:

1. the prohibition of discussion of sensitive matters

2. restricted circulation of sensitive documents

3. restricted access to files

4. strong firm policy against breach, including sanctions, physical and/or geographical separation

*Id.* (citation omitted); *see also LaSalle,* 703 F.2d at 259 (listing similar factors). GM has persuasively argued that London had a substantial relationship with GM through his representation of GM in many lemon law actions and his frequent contact with Adams. The time lapse between London's representation of GM and his employment at K & S was minimal. Despite Respondents' persuasive arguments that K & S's small size will enable them to effectively monitor their ethics screen, this court recognizes that courts analyzing this factor have considered a firm's small size to be a detriment rather than an asset in implementing an effective screen. *See, e.g., Decora,* 899 F.Supp. 132, at 140–41 (stating that "relatively small size" of approximately forty-attorney firm was one factor in determining screening mechanism to be ineffective); *Weglarz v. Bruck,* 128 Ill.App.3d 1, 83 Ill.Dec. 266, 270, 470 N.E.2d 21, 25 (Ill.App.Ct.1984) (affirming decision to disqualify firm in part because the firm "was a small law firm where presumably there is more contact between the attorneys than would exist in a large, departmentalized firm"). As the lawyer assigned to manage day-to-day matters for GM in over twenty lemon law cases while at McBreen, it can be assumed that the nature of London's involvement was fairly substantial. GM Motion to Disqualify, Ex. B, ¶ 14 (Adams Aff.). However, the comprehensiveness of K & S's ethics screen and its timely implementation convince this court that the screen is and will continue to be effective in protecting any information or confidences that London may possess from being disseminated to any other member of K & S.

■ This court notes that K & S took great care to implement its ethics screen before London began his employment at K & S.[8] *See LaSalle,* 703 F.2d at 259 (noting the importance of the existence of a screen "at the time when the potentially disqualifying event occurred, either when the attorney first joined the firm or when the firm accepted a case presenting an ethical problem"). The K & S ethics screen also satisfies the four factors of an effective screen enumerated by Chief Justice Nix in *Maritrans.*[9] First, the screen clearly prohibits the "discussion of sensitive matters." Paragraph six of the screen states:

There is an absolute prohibition of any conversations or discussions with, around, near, or in the presence of the screened attorney concerning or relating to the screened files and/or matters. Any employee who violates this policy will be terminated and will be subject to disciplinary proceedings.

Ex. GM–6B. GM believes that this provision is inadequate, arguing that the term "screened files and/or matters" refers only to current K & S cases against GM and that there is no prohibition against London revealing information he gained while representing GM in past actions. This argument is weak, especially considering the fact that an introductory paragraph of the screen

---

8. On May 31, 1995, Kimmel and Silverman held a meeting with all K & S employees to implement the ethics screen and explain its provisions. London did not accept K & S's offer of employment until June 2, 1995, and he did not begin work there until June 7, 1995.

9. During the evidentiary hearing, it was brought to the court's attention that a copy of the screen that London sent to GM via facsimile on June 19, 1995 differs from copies of the screen signed by K & S employees. *Compare* Ex. GM–6B *with* Ex. GM–24. However, the only difference is that the copies signed by K & S employees contain an additional introductory paragraph which simply states that due to the firm's practice, it is possible that K & S might employ persons who were previously involved in lemon law defense work. This court attaches no significance to this discrepancy.

states: "The purpose of this policy is to prevent the inadvertent or intentional spread of prior client confidences."[10] GM also argues that as shareholders of K & S, Kimmel and Silverman are not "employees" and are therefore not subject to the disciplinary provisions of paragraph six. However, a shareholder of a professional corporation may certainly also be an employee of that corporation. *See, e.g., Gorman v. North Pittsburgh Oral Surgery Assocs.*, 664 F.Supp. 212, 214 (W.D.Pa.1987) (stating that a professional corporation "enables a professional to employ him or herself"). This court finds that Kimmel, Silverman, and London fully understand their obligations under the Rules of Professional Conduct and consider themselves bound by the ethics screen, including paragraph six. The screen clearly provides for restricted circulation of sensitive documents and restricted access to files.[11] K & S has also implemented several other policies to further ensure compliance with the Rules of Professional Conduct. For example, each GM file is color coded or otherwise marked such that it is readily identifiable from a distance, and K & S has established a call screening procedure so that no claimant against GM will have any contact with London. *See* Ex. GM–6B ¶¶ 1, 2 & 8. Finally, this court is satisfied that K & S has a strong firm policy against breach of the screen.[12]

Despite K & S's strict provisions against violation of the screen, GM argues that paragraph twelve of the screen, entitled Structural Divisions, has been breached by Kimmel.[13] Paragraph twelve reads as follows:

> word security system. Any employee found providing access for the screened attorney will be terminated.
>
> 7. Before the screened attorney enters the office of any other attorney or conference room or strategic room, he/she must have another employee ensure that the meeting area/office does not contain any screened file or material. Any violation of this policy will constitute grounds for suspension or termination.
>
> 9. No documents, files, and/or information containing the screened files may be circulated. Any and all information on these files/claims must be returned to the file and be in the possession of the handling attorney at all times.
>
> Ex. GM–6B.

10. GM expert witness Edward Mullinix testified that this statement of purpose is inadequate in part because it uses the word "confidences" instead of the word "information." Tr., Oct. 5, 1995, at 287. Although use of the word "information" may have more accurately reflected the provisions of Rules 1.6 and 1.9(b), this court finds that London and K & S fully understand and have complied with the Rules of Professional Conduct which prevent London from revealing information relating to his representation of GM without its consent or using information relating to this representation to GM's disadvantage.

11. For example, the screen contains the following provisions:

3. Any and all files which are subject to the screen will be placed under lock and key in a separate office/storage area to which the new attorney will not be provided access, when they are not in use. The keys to the locked file area will be in the possession of the managing partner [Silverman] and will not be accessible to the new attorney. The screened files can only be removed from the separate file room under the supervision of the managing partner and the files must be logged in and logged out. The log will indicate the file name, attorney removing file, date removed, location of file and time returned. The location of each file will be accounted for at the end of each day.

4. The screened attorney will be physically separated from the files/file room and will not be allowed into the screened file room at any time. The screened attorney's office will be located away from the screened file room and those employees actually involved with the screened files.

5. Any and all information contained on a computer/network related to the screened files will be protected from access by the screened attorney through the use of a pass-

12. Paragraph thirteen of the screen, entitled Penalties/Sanctions, states:

> Any employee(s) discovered violating any aspect of the screening policy will be immediately disciplined. In the event the violation was inadvertent, the offending employee(s) will receive written warning of the violation and [will be] reinstructed on the policy. Subsequent violations by the same employee(s) will result in further discipline, including termination.
>
> Ex. GM–6B.

13. Silverman as well as Respondents' expert witness, Schwartzman, testified that paragraph twelve is an administrative policy that helps to facilitate the screen but is not part of the screen itself. Tr., Sept. 27, 1995, at 14 (Silverman testimony); Tr., Oct. 5, 1995, at 369–70 (Schwartzman testimony). Silverman also testified that paragraph twelve could be changed

Robert M. Silverman is the partner responsible for handling General Motors Corporation warranty litigation.

Craig Thor Kimmel is the partner responsible for handling warranty litigation against all of the other automobile manufacturers.

Ex. GM–6. Kimmel sent a July 11, 1995 letter to Customer Assistance Manager Jacqueline Vessel of GM's Chevrolet Motor Division. See Ex. GM–20. Since the implementation of the screen, Kimmel has also signed engagement letters in GM cases. See Exs. GM–3A; GM–3B; GM–3C; see also Tr., Oct. 5, 1995, at 71–72 (Kimmel's testimony that "[t]here have been a few opportunities that have come up where I have signed an engagement letter [in GM cases] because either the client knew somebody that I knew and wanted to see my name on the signature line on an opening letter saying we represent this client"). This court finds that these actions violate neither the language nor the spirit of paragraph twelve. Although Silverman is the partner responsible for handling GM warranty cases and Kimmel is the partner responsible for handling non–GM warranty cases, nothing in the screen states that Kimmel cannot have any involvement in GM cases or that Silverman cannot have any involvement in non–GM matters. The screen

would arguably be more effective if Kimmel were never to have any contact with GM cases, but this court finds no reason why Kimmel should not be allowed to handle administrative aspects of GM-related matters, especially at times when Silverman is unavailable, which was apparently the factual scenario involved regarding the July 11, 1995 letter to Vessel. See Tr., Sept. 27, 1995, at 89–90 (Silverman testimony).[14]

Respondents have satisfied the burden of showing that London "is apportioned no part of the fee" from K & S's representation of lemon law cases against GM, pursuant to Rule 1.10(b)(1). Silverman testified on cross-examination that London receives a straight salary that will not be increased or decreased depending on revenue derived from GM litigation. See Tr., Sept. 27, 1995, at 12. Revenue derived from all cases is deposited in a single account from which K & S pays its operating expenses, including salaries. See id. This court finds that K & S's anticipated revenues from non-GM cases will cover London's salary and any additional overhead his employment may incur, and there is nothing in the record that would suggest otherwise.[15]

Respondents have satisfied their burden to show that written notice was promptly given to GM pursuant to Rule 1.10(b)(2). London sent a letter to Adams by certified mail on

---

without affecting the "integrity of the wall." Tr., Sept. 27, 1995, at 15. Although this court agrees that this structural division is not a necessary element for the effective screening of London, this paragraph is one of the paragraphs included in the document entitled "Kimmel & Silverman Ethics Screen (a.k.a. Chinese Wall) Policy" and as such should be considered part of the screen as implemented by K & S.

**14.** Even if Kimmel's actions were construed as a breach of the ethics screen, this court believes that Kimmel's minimal involvement in these matters would not amount to a material breach that would justify the disqualification of K & S.

**15.** GM cites language of a Second Circuit case in support of its argument that London cannot effectively be prevented from deriving some part of his salary from revenues generated by K & S's representation of GM cases. See Armstrong v. McAlpin, 606 F.2d 28, 34 (2d Cir.1979) (stating that "there is no effective way to prevent an upward adjustment of the disqualified attorney's salary, if he is an associate, or share of all other firm earnings, if he is a partner"), vacated, 625

F.2d 433 (2d Cir.1980), vacated, 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981). However, an en banc panel vacated this case on the merits, and although the panel did not explicitly address the issue of fee apportionment, it implicitly rejected the logic of the earlier decision by affirming the district court's decision to deny the motion for disqualification. See 625 F.2d at 446. This en banc decision itself was vacated by the Supreme Court on jurisdictional grounds. See 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981). This court declines to consider either the 1979 McAlpin decision or the subsequent vacating decision to be persuasive authority in the instant case.

At least one court has stated that even a shareholder in a firm can be effectively screened from fees generated by the representation of certain clients. See In re McLaren, 115 B.R. 922, 926 (Bankr.N.D.Ohio 1990) ("Although Mr. Griffith is a shareholder of the New Firm, he does not share in profits and therefore will not participate in any fees received from the plaintiffs by the New Firm."). In the instant case, London receives a set salary, does not share in K & S's profits, and is not even a shareholder of K & S.

June 2, 1995, informing her that he resigned from McBreen on or about May 26, 1995, that he was offered employment as a litigation associate by K & S on May 31, 1995, that he would have no involvement on GM cases at K & S, that K & S had implemented an ethics screen, and that he would be "barred from discussing any aspect of [GM] cases with anyone at the firm." London also stated in this letter that a copy of the screen would be available to Adams and GM upon request. *See* Ex. GM–4. This court finds this written notice to be prompt, given that London had received the offer from K & S on May 31, 1995 and did not accept the offer until June 2, 1995, the day he sent this letter to Adams. This letter was certainly sufficient notice to "enable [GM] to ascertain compliance with the provisions of [Rule 1.10]," because based on this notice, GM would be able to make an informed inquiry as to whether the screen and fee-apportionment system were adequate. Thus, in short, this court finds that Respondents have effectuated an extremely thorough and effective screen and have complied with all of the other requirements of Rule 1.10.[16] The effectiveness of any ethics screen depends upon the integrity of the individuals who comply with it. This court has no doubt that Respondents understand their ethical obligations and will continue to adhere to the Rules of Professional Conduct and their ethics screen.

Finally, some courts have held that a disqualified attorney and his law firm should attest to screening procedures under oath. *See Cromley,* 17 F.3d at 1065; *Kovacevic v. Fair Automotive Repair, Inc.,* 641 F.Supp. 237, 244 (N.D.Ill.1986). Although the testimony of Silverman, Kimmel, and London has satisfied this court that the ethics screen was in place when London began his employment at K & S, that the provisions of the screen have been and will continue to be complied with, and that London will be apportioned no fee derived from cases against GM, this court holds, out of an abundance of caution, that London and K & S, through its partners Kimmel and Silverman, should attest to these facts and the specific screening provisions under oath. *See Kovacevic,* 641 F.Supp. at 245 (denying disqualification motion but ordering supplemental affidavit to ensure compliance with ethics rules).

## Conclusion

For the reasons set forth above, this court denies GM's motion to disqualify Respondents. Respondents' counsel must file supplemental affidavits in accordance with the above ruling. An appropriate order follows.

## *ORDER*

AND NOW, this 27 day of November, 1995, upon consideration of the Motion of General Motors Corporation to Disqualify Kimmel & Silverman, P.C. and Jay London, Esquire, from Representing Clients in Suits Against General Motors Corporation in Automobile Warranty Litigation, Respondents' response thereto, and all other related briefs and memoranda of law, and following an evidentiary hearing that took place over four separate days, it is hereby ORDERED that the Motion to Disqualify is DENIED.

It is FURTHER ORDERED that Respondents Jay London, Esquire, and Kimmel & Silverman, P.C., through its partners Robert

---

16. GM has presented evidence that K & S continued to represent clients in some actions in which London may have filed for extensions of time or worked on to some extent while at McBreen. *See* Exs. GM–2A; GM–2B; GM–2C; GM–16; GM–17; GM–18; GM–19. In addition, Silverman sent a September 19, 1995 letter to Attorney Hillary Remick of McBreen regarding a release in a case that K & S had referred out to another attorney because London had some involvement in the case while at McBreen. *See* Ex. GM–10. GM argues that Silverman's letter to Attorney Remick expressing his disapproval of the release somehow compromises the integrity of the screen. This court finds that none of these allegations has any effect on the integrity or effectiveness of the ethics screen. Although London may certainly not represent clients against GM in these matters or any others in which he represented GM, K & S may do so because K & S has implemented an effective screen. *See, e.g., Cromley v. Board of Educ.,* 17 F.3d 1059, 1064–66 (7th Cir.) (affirming decision that law firm may continue to represent defendants in case in which attorney who formerly represented plaintiff in same case withdrew from representation of plaintiff and joined firm representing defendants because law firm's screening mechanism was effective and timely), *cert. denied,* —— U.S. ——, 115 S.Ct. 74, 130 L.Ed.2d 28 (1994).

284

Silverman and Craig Kimmel, submit supplemental affidavits attesting to the following:

1. that Jay London and the law firm of Kimmel & Silverman, P.C. have complied with and will continue to comply with the specific provisions of the ethics screen established by Kimmel & Silverman, P.C.;

2. that Jay London has not been and will not be apportioned any part of fees derived from Kimmel & Silverman, P.C.'s representation of clients against GM in automobile warranty/lemon law cases;

3. that the Kimmel & Silverman, P.C. ethics screen was in effect before London began his employment at Kimmel & Silverman, P.C. on June 7, 1995.