J-A15033-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| STEPHANIE FETTERMAN | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SIMON E. COCHRAN | : | |
| | : | |
| Appellant | : | No. 1300 WDA 2021 |

Appeal from the Order Entered October 21, 2021
In the Court of Common Pleas of Armstrong County
Civil Division at No(s): 2018-092-CIVIL

BEFORE: BOWES, J., KUNSELMAN, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.: **FILED: NOVEMBER 16, 2022**

Simon Cochran ("Mr. Cochran") appeals from the order denying his motion to disqualify Alaine Generelli, Esquire ("Attorney Generelli") and the law firm of Geary, Loperfito & Generelli, LLC ("the GLG firm") from representing Stephanie Fetterman ("Ms. Fetterman"). We affirm.

While employed at the office of Gregory W. Swank, Esquire ("Attorney Swank"), Shea Kraft, Esquire ("Attorney Kraft") represented Mr. Cochran in a custody case against Ms. Fetterman. Attorney Generelli, a member of the GLG firm, represented, and continues to represent, Ms. Fetterman in that case. Thereafter, Attorney Kraft left Attorney Swank's employ to work for the GLG firm. *See* N.T., 10/20/21, at 11-15, 19-20, 47.

Mr. Cochran filed a motion to disqualify Attorney Generelli and the GLG firm in which he averred that Attorney Kraft learned secret and confidential information relating to his case while representing him, and that Attorney

Generelli's and the GLG firm's continued representation of Ms. Fetterman constituted a conflict of interest and a violation of Pennsylvania Rules of Professional Conduct 1.9 and 1.10 ("Rules 1.9 and 1.10"). **See** Motion to Disqualify, 10/19/21, at 1-2 (unnumbered). Other clients whom Attorney Kraft had represented while working for Attorney Swank filed similar disqualification motions against Attorney Generelli and the GLG firm.[1] On October 20, 2021, the trial court held an evidentiary hearing on all the disqualification motions.

We summarize the testimony at the evidentiary hearing as follows. In August 2021, Attorney Swank began reducing Attorney Kraft's workload and expressed a clear intent to terminate his employment. **See** N.T., 10/20/21, at 11-13. Attorney Kraft had exploratory employment discussions with the GLG firm. **See id**. at 13-15. Later that month, Attorney Kraft told Attorney Swank that he intended to find a new job, and they discussed some of Attorney Kraft's active case files. Thereafter, Attorney Kraft found that his key no longer opened the door to the main office of Attorney Swank's firm. **See id**. at 15-18. At that time, the GLG firm had not yet hired Attorney Kraft and he was considering a number of employment possibilities. **See id**. at 14, 23-26.

---

[1] Three of those cases are now on appeal before this Court, **Wheatley v. Wheatley**, **Hatch v. Hatch**; and **Dietrich v. Dietrich**, and are listed consecutively before this panel at J-A15031-22, J-A15032-22, and J-A15034-22. We address those appeals in separate decisions.

We summarize the testimony at the evidentiary hearing as follows. In August 2021, Attorney Swank began reducing Attorney Kraft's workload and expressed a clear intent to terminate his employment. *See* N.T., 10/20/21, at 11-13. Attorney Kraft had exploratory employment discussions with the GLG firm. *See id*. at 13-15. Later that month, Attorney Kraft told Attorney Swank that he intended to find a new job, and they discussed some of Attorney Kraft's active case files. Thereafter, Attorney Kraft found that his key no longer opened the door to the main office of Attorney Swank's firm. *See id*. at 15-18. At that time, the GLG firm had not yet hired Attorney Kraft and he was considering a number of employment possibilities. *See id*. at 14, 23-26.

Prior to hiring Attorney Kraft, the GLG firm had a series of consultations with an ethics attorney, Beth Ann Lloyd, Esquire ("Attorney Lloyd"), to determine, if it hired Attorney Kraft, what actions it would need to take to comply with the screening requirements of Rule 1.10 in Mr. Cochran's case and any other active case in which Attorney Generelli had been Attorney Kraft's opponent (the "conflict cases"). *See id*. at 47, 57-58. Attorney Lloyd explained to the GLG firm that Attorney Kraft would have to withdraw from representation in the conflict cases, and that the GLG firm would need to screen him from any contact with the physical or electronic files in those cases, prevent him from hearing any discussion of them, and not share with him any of the fees in those cases. *See id*. at 47, 58-59. Attorney Generelli also told

the entire GLG staff that screening procedures would be put into place if Attorney Kraft were hired. *See id*. at 50-51.

The GLG firm hired Attorney Kraft, having told him that his employment was contingent upon his compliance with the ethical rules, and directed him to follow all of Attorney Lloyd's recommendations. *See id*. at 47-48, 57-59, 75.[2] Attorney Lloyd helped Attorney Kraft write a letter which he sent to Mr. Cochran one week before he began working at the GLG firm. *See id*. at 21, 32.[3] The letter stated that Attorney Kraft would be joining the GLG firm, would withdraw from representing Mr. Cochran, would not participate in the case at the GLG firm in any way or reveal confidential information about Mr. Cochran, the case, or the litigation strategy, and had not taken any case files or materials concerning the case. The letter also explained to Mr. Cochran the procedures the GLG firm would use to protect Mr. Cochran's confidences and to isolate Attorney Kraft from access to the physical and electronic files in the case. *See id*. at 24-28. Additionally, the letter stated that Mr. Cochran's case would not be discussed in Attorney Kraft's presence, and that Attorney Kraft would not share in any of the fees paid to the GLG firm in the case. *See id*.

---

[2] Attorney Swank immediately removed Attorney Kraft from his offices when Attorney Kraft told him about his new employment, which prevented them from discussing the remainder of Attorney Kraft's active cases. *See* N.T., 10/20/21, at 16-18.

[3] Attorney Kraft sent similar letters to his former clients in the other conflict cases. *See* N.T., 10/20/21, at 22-28.

at 23-26, 28, 30, 43, 47. Attorney Generelli's testimony confirmed Attorney Kraft's testimony. *See id*. at 53, 56-59. The letter provided Mr. Cochran with Attorney Kraft's cell phone number, personal email address, fax number, and mailing address. *See id*. at 24-25.[4]

By the time Attorney Kraft began work at the GLG firm in mid-September 2021, the firm had expended substantial time and effort and implemented all of Attorney Lloyd's suggested screening procedures: physical documents in the conflict case files, other than those kept in Attorney Generelli's office, are maintained in a locked filing cabinet; and the electronic files in those cases, and Attorney Generelli's email, are password-protected and segregated from other electronic case files. *See id*. at 48-49, 59-61, 64, 70-72, 75. Additionally, prior to the time Attorney Kraft began working at the GLG firm, Attorney Generelli advised the entire firm and staff[5] about the screening procedures and directed them to: promptly remove conflict case documents from the copier; put faxes[6] relating to conflict cases in special

---

[4] At the hearing on the joint disqualification motions, neither Mr. Cochran nor any other former client in the conflict cases introduced evidence of responding to Attorney Kraft's letter or alleged that Attorney Kraft disclosed confidential information in any conflict case.

[5] Attorney Kraft testified that the GLG firm now has four lawyers and also employs a paralegal, a secretary, an office manager/paralegal, and a receptionist, which Attorney Generelli's testimony corroborated. *See* N.T., 10/20/21, at 35-37, 39, 50, 65-66, 70.

[6] Attorney Generelli receives faxes infrequently. *See* N.T., 10/20/21, at 70.

folders and take them to her office; and print documents in conflict cases on their own printers and bring them directly to her. *See id*. at 47-54, 59-60, 67-69. The GLG firm also changed its docketing system. *See id*. at 59. Employees must seek assistance to see written documents in a conflict case. *See id*. at 65-66, 72-73.

Attorney Kraft testified that the GLG firm explained the screening procedures to him before he began working at the firm. *See id*. at 43. Since he joined the GLG firm, he has not seen, or had access to, any of the conflict case files, has not discussed any of the conflict cases with anyone at the GLG firm, has not disclosed any confidential information concerning the conflict cases, has not heard any discussion of those cases, and recognizes his duty under the Rules of Professional Conduct to maintain the confidences of his former clients. *See id*. at 26-30, 38-43. Attorney Generelli also testified that Attorney Kraft has been screened from all of the conflict cases and has never disclosed confidential information to her concerning those cases. *See id*. at 52, 54. Attorney Kraft's employment contract specifies that he can be fired for violating the Rules of Professional Conduct. *See id*. at 38.

Attorney Generelli, the primary attorney who works on the conflict cases, has instructed her paralegal, the only employee who works with her on those cases, not to discuss them in front of Attorney Kraft. *See id*. at 45-46, 50, 67. Attorney Generelli testified that she has been "pretty firm and direct" with staff about what they must do to comply with the screening protocols and

continues to discuss them with staff on an ongoing basis. *See id*. at 52, 60. Additionally, all of the GLG staff observed the time and energy the firm expended putting the protocols in place and understood that the firm took the matter very seriously. *See id*. at 64. Though the firm did not create a separate, written screening document for staff, it used Attorney Lloyd's written advice about the necessary elements of a screen to formulate its screening protocols, all of which it implemented prior to the inception of Attorney Kraft's employment and all of which Attorney Generelli conveyed to the entire GLG firm. *See id*. at 48-49, 59-61, 64, 67, 70-73, 75-76.

Testimony at the disqualification hearing established that when employed by Attorney Swank, Attorney Kraft performed fifteen hours of work on Mr. Cochran's case in the two years he worked on it, which included researching psychological evaluations and preparing for a custody trial that was continued. Two other attorneys worked on the case. *See* N.T., 10/20/21, at 46, 85.[7]

The day after the hearing, the trial court entered an order denying Mr. Cochran's disqualification motion and all of the other disqualification motions. The trial court found that Attorney Kraft, Attorney Generelli, and the GLG firm

_____

[7] No evidence was presented at the hearing that Mr. Cochran had responded to Attorney Kraft's letter, and Mr. Cochran did not assert that Attorney Kraft had disclosed confidential information about his case.

had not violated Rule 1.9 or Rule 1.10. **See** Trial Court Order, 10/21/21. Mr. Cochran filed a notice of appeal and, days later, filed a Pa.R.A.P. 1925(b) statement.[8] The trial court complied with Rule 1925(a).

Mr. Cochran raises the following issue for our review:

> Did the trial court err in concluding that [Mr. Cochran's] trial counsel, having left his employment with the law firm representing [Mr. Cochran] in active litigation and then immediately becoming employed by the law firm representing the opposing party in the same litigation, did not violate the terms of Rule 1.10 of the Rules of Professional Conduct requiring that [Attorney Kraft's] new employer be disqualified from representing the opposing party in the litigation?

Mr. Cochran's Brief at 8.[9]

_____

[8] This is a children's fast track appeal, **see** Pa.R.A.P. 102. Appellants in such cases, must file their Rule 1925(b) statement with their notice of appeal, which Mr. Cochran failed to do. **See** Pa.R.A.P. 1925(a)(2)(i). We nevertheless decline to quash Mr. Cochran's appeal because he substantially complied with the rule, and his initial non-compliance with the rule did not occasion prejudice to any of the parties and did not impede the trial court's ability to issue an opinion. **See In Re K.T.E.L**, 983 A.2d 745, 747 (Pa. Super. 2009) (holding that the failure to file a Rule 1925(b) statement with the notice of appeal in a children's fact track case resulted in a defective notice of appeal, but that quashal was not **compelled** where neither party suffered prejudice as a result).

[9] Mr. Cochran makes no argument concerning the Rule 1.9 violation claim he raised in the trial court. Accordingly, we will not review it. **See Commonwealth v. Fletcher**, 986 A.2d 759, 785 (Pa. 2009) (indicating that a claim is waived where appellant fails to cite pertinent authority or relevant detail in his brief). We note that Rule 1.9 precludes an attorney from representing a party in a litigation where he has previously represented the party's opponent. Mr. Cochran does not allege that Attorney Kraft represents Ms. Fetterman.

As a preliminary matter, we note that an order denying a motion to disqualify a law firm for an alleged conflict of interest is immediately appealable as a collateral order. ***See Rudalavage v. PPL Elec. Util. Corp.***, 268 A.3d 470, 478 (Pa. Super. 2022); ***see also*** Pa.R.A.P. 313 (governing collateral orders).

Mr. Cochran asserts that Rule 1.10(b) compels the disqualification of Attorney Generelli and the GLG firm from continuing to represent Ms. Fetterman in the case against him because his former counsel, Attorney Kraft, now works at the GLG firm. Under Rule 1.10(b), when a lawyer leaves one law firm for another, his new firm may represent a person on a matter he previously worked on for a client with materially adverse interests (and acquired protected information that is material to the matter) if: (1) the firm screens the lawyer from any participation in the matter and he receives no fee for it, and (2) the lawyer gives prompt, written notice to his former client so that the client may ascertain the lawyer's compliance with the rule. ***See*** Rule 1.10(b). Screening requires the lawyer's isolation from participation in the matter through "the timely imposition of procedures . . . reasonably adequate under the circumstances to protect information that the lawyer is obligated to protect . . .." Rule 1.0(k).

When reviewing a trial court's order on the disqualification of counsel, this Court employs a plenary standard of review. ***See Darrow v. PPL***

*Electric Utilities Corp.*, 266 A.3d 1105, 1111 (Pa. Super. 2021).  The law recognizes that it is appropriate to sanction attorneys for violating ethical rules.  *See McCarthy v. Southeastern Pennsylvania Transp. Auth.*, 772 A.2d 987, 989 (Pa. Super. 2001).  However, disqualification is not freely granted.  Pennsylvania courts assign particular importance to protecting a party's right to counsel of his choice.  *See Rudalavage*, 268 A.3d at 478.  Disqualification, therefore, is only appropriate when another remedy is not available and, more important, when the right to counsel of one's choice interferes with the essential need to ensure that the party seeking disqualification receives their due process right to a fair trial.  *Id*.  The Pennsylvania Supreme Court reserves for itself the power to punish attorney misconduct.  *See Reilly by Reilly v. Southeastern Pennsylvania Transp. Auth.*, 489 A.2d 1291, 1299 (Pa. 1985) (stating that violations of the Rules of Professional Conduct are not a proper subject for consideration of the lower courts to impose punishment for attorney misconduct).

To assess the reasonable adequacy of a law firm's screening procedures when it hires an attorney who previously worked for the opposing party in an active case, our Courts weigh a series of factors federal courts have identified.  *See Rudalavage*, 268 A.3d at 479 (citing *Dworkin v. General Motors Corp.*, 906 F.Supp. 273, 279-80 (E.D. Pa. 1995)); *see also Darrow*, 266 A.3d at 1112 (same).  The "*Dworkin*" factors include: (1) the substantiality

of the relationship between the attorney and the former client; (2) the time lapse between the matters in dispute; (3) the size of the firm and the number of disqualified attorneys; (4) the nature of the disqualified attorney's involvement; and (5) the timing of the wall. *See Rudalavage*, 268 A.3d at 479; *see also Darrow*, 266 A.3d at 1112. Rule 1.10 and the *Dworkin* factors place particular emphasis on the creation by the attorney's new firm of a reasonably adequate wall or screen[10] to protect information the disqualified attorney is obligated to protect. The critical factors concerning the screen are whether it: (1) prohibits the discussion of sensitive matters; (2) restricts the circulation of sensitive documents; (3) restricts access to sensitive files; and (4) manifests a strong firm policy against breach, including sanctions, physical and/or geographical separation. *See Rudalavage*, 268 A.3d at 480 (citing *Dworkin*, 906 F.Supp. at 280); *see also Darrow*, 266 A.3d at 1112 (also citing *Dworkin*).

On appeal, Mr. Cochran argues that Ms. Fetterman failed to show that the GLG firm complied with Rule 1.10(b). He contends that Attorney Kraft's prior involvement in his case and the substantiality of their attorney-client relationship, as well as the short time lapse between the matters in dispute,

_____

[10] Courts use the terms "wall" and "screen" somewhat interchangeably. Because Rules 1.10 and 1.0(k) use the terms "screened" and "screen," we primarily use those terms.

- 11 -

and the small size of the GLG firm, support disqualification. He also asserts that the screen was deficient since it was not in writing and did not explicitly state the penalties for staff for violating the screen. Mr. Cochran further asserts that his continuing interest in Attorney Kraft's loyalty weighs heavily in favor of disqualification of the entire GLG firm. To that end, Mr. Cochran requests that the Court follow ***Norfolk Southern Ry. v. Reading Blue Mountain and Northern Ry. Co.***, 397 F. Supp. 2d 551 (M.D. Pa. 2005), which disqualified a law firm from representation under what he asserts were similar factual circumstances.

As the trial court noted, the GLG firm retained a legal ethics attorney and followed all of her recommendations, which resulted in Attorney Kraft sending prompt letters to his clients that complied with the requirement of Rule 1.10(b)(2), and the GLG firm instituted screening protocols prior to Attorney Kraft's start date at the GLG firm under which it keeps the physical conflict files in a locked filing cabinet and password-protects the electronic conflict files (and Attorney Generelli's email) to screen them from Attorney Kraft. ***See*** Trial Court Opinion, 11/10/21 at 1-2, 4. Therefore, as the trial court stated, Mr. Cochran's motion sought prophylactic relief unconnected to any actual Rule of Professional Conduct violation. ***See id***. at 4. The trial court also recognized that its ability to disqualify lawyers under the Rules of Professional Conduct is narrow, and that disqualification is a serious remedy

that should not interfere with a party's right to choose counsel unless due process and the opposing party's right to a fair trial is affected. *See id*. at 3-4 (citing *In re Estate of Pedrick*, 482 A.2d 215, 221 (Pa. 1984)). The trial court found no violation of the Rules of Professional Conduct and therefore no basis for the disqualification of Attorney Generelli or the GLG firm. *See id*. at 4-5.

We agree with the trial court that Attorneys Kraft and Generelli and the GLG firm did not violate Rule 1.10(b). *See* Trial Court Opinion, 11/10/21, at 1-2, 4 (relying upon the testimony at the disqualification hearing). We further conclude that because there was no violation of the Rules of Professional Conduct, Mr. Cochran did not suffer an impairment of his due process right to a fair trial that would require disqualification. Further, the "*Dworkin*" factors that might weigh in favor of disqualification do not compel the extreme remedy Mr. Cochran seeks.

At the outset, Attorney Kraft satisfied the requirement of Rule 1.10(b)(2) by sending a prompt letter to Mr. Cochran and all the other clients he had represented in the conflict cases. Mr. Cochran offered no evidence that he replied to the letter Attorney Kraft sent to express a concern about Attorney Kraft's move to the GLG firm.

This case turns on the reasonable adequacy of the GLG firm's screen. The very short lapse of time between Attorney Kraft's representation of Mr.

Cochran and his move to the GLG firm, which represents Mr. Cochran's opponent, supports Mr. Cochran's position. However, that factor would weigh more heavily if Attorney Kraft had actively represented Ms. Fetterman or had the GLG firm's screen been defective, and neither is the case in this matter.[11]

The GLG firm undertook timely and good-faith efforts to create a set of screening procedures "reasonably adequate under the circumstances" to protect information that Attorney Kraft was obligated to protect. **See** Rules 1.0(k), 1.10(b). The firm consulted with an ethics attorney to construct the screen, and substantially restructured its physical storage, computer, and document circulation policies to prevent any sensitive material from reaching Attorney Kraft. Further, the firm erected its screen **before** Attorney Kraft joined the firm. **See Dworkin**, 906 F.Supp. at 280 (noting the importance of

---

[11] Given the limited evidence Mr. Cochran presented at the hearing, it is difficult to assess the factors relating to the substantiality of the relationship between the attorney and the former client, and the nature of the disqualified attorney's involvement in the case. Mr. Cochran's evidence established that Attorney Kraft billed fifteen hours on Mr. Cochran's case over the course of two years, the majority of which involved discovery, as well as preparation for a custody trial that was continued, **see** N.T., 10/20/21, at 85, a delay Ms. Fetterman alleges was Mr. Cochran's responsibility. **See** Ms. Fetterman's Brief at 32-33. It is not clear that proves a substantial attorney-client relationship. Further, should there be further litigation of the custody agreement based on new or changed circumstances, Attorney Kraft will not be privy to any such new information. Because we decide this case on other grounds, we do not determine whether there was a substantial attorney-client relationship between Mr. Cochran and Attorney Kraft or whether Attorney Kraft had substantial involvement in the case.

instituting a screening protocol when the potentially disqualifying event occurs). Additionally, neither Mr. Cochran nor any other conflict case client has alleged that the screen has been breached, and the evidence at the disqualification hearing did not show a breach. Attorney Generelli, the primary attorney on the conflict cases, testified that she instructed her paralegal, the only other person who worked with her on those cases,[12] not to discuss them in front of Attorney Kraft. *See* N.T. 10/20/21, at 67. Attorney Kraft testified that he never discussed any conflict case at the GLG firm or heard any of the cases discussed. *See id*. at 21, 30, 41-42. Additionally, all the members of the firm understood the screening protocols. *See id*. at 48-54, 76.

The screen also effectively restricted circulation of, and restricted access to, sensitive documents and files. The GLG firm implemented many procedures to screen conflict matters before Attorney Kraft's arrival. These included the protection of the physical and electronic conflict case files, the change in the firm's docketing system to separate out all of Attorney Generelli's clients, and the creation of a new protocol requiring removing sensitive documents from copiers and immediately placing incoming faxes in

---

[12] Attorney Generelli testified that Attorney Loperfito, another member of the firm, has some limited involvement in family law cases. Attorney Loperfito assists on some financial issues, but he does not directly represent any family law client in court unless Attorney Generelli needs him to fill in, and he has declined to try any custody cases. *See* N.T., 10/20/21, at 73.

a closed mail folder in Attorney Generelli's office. Those undertakings prevented Attorney Kraft from having any exposure to sensitive documents or files. **See id**. at 27, 29, 41-42, 44-46, 48-50, 59, 61, 67-71.[13]

The GLG firm's screen contained a reasonably adequate firm policy against breach, including sanctions, physical and/or geographical separation. **See Rudalavage**, 268 A.3d at 470; **see also Darrow**, 266 A.3d at 1112. Attorney Kraft testified that he was informed that if he breached the Rules of Professional Conduct, he could face disciplinary action and be fired. **See** N.T., 10/20/21, at 30-31, 38. Attorney Generelli confirmed Attorney Kraft's testimony. **See id**. at 53. Attorney Generelli also testified that everyone at the GLG firm knew the screening protocols as a result of an open discussion prior to Attorney Kraft's hiring, and she has ongoing communications with the staff to ensure that the recommended procedures remain in place. **See id**. at 49-50, 52, 60, 64. Further, the entire GLG firm saw how seriously the firm

---

[13] Attorney Kraft testified on cross-examination at the disqualification hearing that he had seen ten or eleven disqualification motions "roll in" on the fax machine. **See** N.T., 10/20/21, at 41-42. Attorney Swank asked him no further questions about that incident, which: (1) was Attorney Kraft's only exposure to anything related to the conflict cases while at the GLG firm, (2) did not risk his disclosing information he was obligated to protect under Rules 1.10(b) and 1.0(k), and (3) concerned documents Mr. Cochran's attorney, Attorney Swank, elected to fax to the GLG firm. This single incident does not undermine the effectiveness of the screen. As noted, Attorney Generelli testified that the GLG firm's screening protocol requires personnel to take faxes quickly to her office when they are received. **See id**. at 68.

regarded the screen. *See id*. at 64. Under these circumstances, we do not find it dispositive that the staff was not explicitly informed of the consequences of violating the screen.[14]

We note that some courts have held that a law firm's small size is a detriment to implementing an effective screen because the attorneys at a small firm have more opportunity for contact with each other than at a large firm. *See Dworkin*, 906 F. Supp. at 280 (collecting cases). We believe that a firm's size is not in itself a determinative measure of the firm's ability to maintain an effective screen. Indeed, *Dworkin* itself implicitly recognizes the limitations of such a blunt measuring device. *See id*. at 283 (stating that "[t]he effectiveness of any ethics screen depends upon the integrity of the individuals who comply with it"). There is a further problem with using the size of a firm as an absolute measure of its ability to maintain an effective

_____

[14] Some courts have assessed the strength of a law firm's screen by focusing on whether it expressly includes a termination penalty for all violators. *See*, *e.g.*, *Norfolk Southern*, 397 F. Supp. 2d at 555. We are aware that a comment to Rule 1.0 states that appropriate screening measures will depend on the circumstances but may include written notice and instructions to all firm personnel other than lawyers forbidding any communication with the screened lawyer relating to the matter. *See* Rule 1.0, cmt. 9. The Comment does not state that a firm's employees must be informed of the consequences for violating the rule. Additionally, under the circumstances here, the GLG firm clearly conveyed its screening protocols orally to its employees. Because GLG's employees heard repeated discussion of those protocols and saw the changes in the operation of the firm, we find that they were clearly and properly alerted to the firm's screening protocols.

screen. Many of Pennsylvania's counties do not have large law firms, and many counties are comprised of mostly small to mid-size firms. We cannot countenance a one-size-fits-all rule, especially where it will have an unreasonably disparate effect on attorneys who practice in smaller counties and wish to change their employment. Thus, while we do not discount the consideration of a firm's size as a factor in assessing the effectiveness of a screen, we agree with the *Dworkin* court that it is the integrity of the people in a firm, and the protocols they adopt and implement, not the size of the firm itself that is relevant to the effectiveness of a screen under Rule 1.10(b). Nothing in the record before us suggests that the GLG firm's size affected its ability to maintain an effective screen.[15]

We also do not agree with Mr. Cochran that the decision in *Norfolk Southern* compels a different result in this case. This Court is not bound by decisions of federal courts other than the United States Supreme Court. *See In re Stevenson*, 40 A.3d 1212, 1221 (Pa. 2012). Moreover, in *Norfolk*

---

[15] We recognize that the *Rudalavage* and *Darrow* courts viewed the small size of a firm as a factor favoring disqualification, and cited *Dworkin* for the proposition that there is more contact between attorneys at a small firm. *See Rudalavage*, 268 A.3d at 481; *Darrow*, 266 A.3d at 1114. As stated, although the size of a firm may favor disqualification, the facts developed at the hearing in this case show that the substantial screen the GLG firm erected, and the efforts it devoted to enforcing the screen, outweighed the concern about the small size of the firm. Moreover, as explained *infra*, other factors of concern present in *Rudalavage* and *Darrow* are not present here.

***Southern***, the law firm opposing disqualification failed to establish that their new attorney, who had previously worked for the other side in an ongoing case, would not receive any of the fees in the case. That failure alone warranted disqualification. ***See Norfolk Southern***, 397 F. Supp. 2d at 554. Additionally, the new law firm in that case failed to provide prompt written notice to the attorney's former firm of the conflict and failed to prohibit the discussion of sensitive matters in the presence of the new attorney. ***See id***. For these reasons, the facts of the ***Norfolk Southern*** case do not establish requirements critical to Rule 1.10 and the case is not substantially similar to the matter before this Court.[16]

***Rudalavage*** and ***Darrow***, recent cases in this Court (which neither party cites), found a law firm's Rule 1.10(b) screening procedures deficient under significantly different circumstances. In ***Rudalavage***, an attorney and his law firm filed a wrongful death suit against PPL Electric Utilities Corporation ("PPL"). The attorney had previously represented PPL in other cases while

---

[16] ***Norfolk Southern*** also states a third set of factors for assessing disqualification that involves examining the affected party's right to attorney loyalty, the effect on other person's right to counsel, and the desire not to unreasonably hinder attorney movement. ***See Norfolk Southern***, 397 F. Supp. 2d at 556. No published Pennsylvania appellate court decision has adopted this test. We do not opine on the relevance of this third set of factors given our conclusion that the trial court did not err in finding that there was no violation of the Rules of Professional Conduct and, more important, no impairment of Mr. Cochran's right to a fair trial.

employed by a previous law firm, during which he acquired confidential knowledge about PPL's litigation strategies. This Court determined that the new law firm should be disqualified. Among the reasons for disqualification cited were: (1) the departing attorney did not provide PPL with prompt written notice of the conflict;[17] (2) the departing attorney served as *de facto* counsel on the case at the new firm by visiting the accident site and reviewing the complaint; (3) the new firm did not erect a screen until almost **two years after** the departing attorney had already worked on the case; (4) the new firm did not have a written policy, and (5) the departing attorney acknowledged that in his previous employment he had gathered significant information concerning how to defend such suits. ***See Rudalavage***, 268 A.3d at 481-83.[18]

---

[17] This Court found the failure to make prompt disclosure of a change in employment to be compelling proof of a Rule 1.10(b)(2) violation. This Court stated that a client should not discover from his current attorney that his former attorney now works for the opposition and that former counsel's failure to disclose that fact created "**a specter of impropriety that no *ex post facto* . . . [w]all can contain***.*" *Rudalavage*, 268 A.3d at 483 (citation omitted) (emphasis in original); ***see also Darrow***, 266 A.3d at 1115 (same).

[18] ***Darrow*** involved the same attorney and law firm whose disqualification this Court found to be required in ***Rudalavage***. In ***Darrow***, the attorney and the new law firm filed a personal injury suit against PPL three years after the attorney left the law firm at which he represented PPL. Among other factors supporting disqualification, the Court noted: (1) the attorney was privy to proprietary information about PPL; (2) the attorney did not promptly disclose the conflict in writing to his former client; (3) the attorney was counsel of

*(Footnote Continued Next Page)*

Here, Attorney Kraft promptly disclosed the conflict in writing to Mr. Cochran, his former client, there is no evidence that Mr. Cochran responded to Attorney Kraft's letter, and Attorney Kraft has not worked as opposing counsel on the Fetterman-Cochran litigation at the GLG firm. Further, there is no evidence that Attorney Kraft used or disclosed Mr. Cochran's confidential information, and the GLG firm erected its screen **before** he began working there. For these reasons, ***Rudalavage*** and ***Darrow*** address substantively distinguishable facts and are not determinative of whether the GLG firm's screen was reasonably adequate under the factual circumstances here.

We also agree with the trial court that on this record, Mr. Cochran has failed to show that disqualification of Attorney Generelli and the GLG firm is necessary to ensure his due process right to a fair trial. ***See McCarthy***, 772 A.2d at 989. Our Supreme Court has clearly stated that violations of the Rules of Professional Conduct are not a proper subject for the lower courts to impose punishment for attorney misconduct. ***See Reilly***, 489 A.2d at 1299; ***see also Pedrick***, 482 A.2d at 221 (stating that counsel may be disqualified only when necessary to ensure the right to a fair trial, and that trial courts are not accorded the power to punish attorney misconduct). Because Attorney

_____

record for two years in the personal injury case; (4) the new law firm is small; (5) the screen was not erected for two years **after** the filing of the suit; and (6) the screening policy was not in writing. ***See Darrow***, 266 A.3d at 1113-15.

- 21 -

Generelli and the GLG firm did not violate Rule 1.10(b), there was no basis for disqualification and no interference with Mr. Cochran's right to a fair trial.[19] Thus, the trial court properly denied Mr. Cochran's disqualification motion.

Order affirmed.

Judge Bowes joins in this memorandum.

Judge Kunselman concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/16/2022

---

[19] We do not ignore Mr. Cochran's assertion of his expectation of attorney loyalty. However, Mr. Cochran has not demonstrated that the trial court erred when it found that the record did not support the disqualification of Attorney Generelli and the GLG firm from participating in the case, and there was no evidence at the hearing that Attorney Kraft disclosed any privileged or confidential information about Mr. Cochran's case to the GLG firm. Moreover, we will not lightly disturb **Ms. Fetterman's** right to representation by counsel of her choice. ***See Rudalavage***, 268 A.3d at 478.